THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GEORGE DAVIS, Defendant-Appellant.

First District (2nd Division)   No. 1—94—1948

Opinion filed March 11, 1997.

48

HOURIHANE, J., dissenting.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Tyra Taylor-Bell, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

After a jury trial, defendant George Davis was found guilty of first degree murder and sentenced to 50 years' imprisonment. Defendant contends on appeal that: (1) the State committed a *Batson* violation; (2) the trial court erred in granting the State's motion *in limine* preventing the defense from eliciting evidence of occurrence witnesses' gang affiliation; (3) he was provided ineffective assistance of counsel when his counsel failed to properly investigate defendant's prior conviction, informed the jury that defendant would testify, and then later attempted to explain to the jury why defendant did not

testify; (4) the prosecutor made improper remarks in closing argument; and (5) the trial court erred in relying on defendant's causing or threatening serious harm as an aggravating factor in sentencing. We reverse and remand.

Anthony Fisher, whose nickname was "Buck," testified that on May 29, 1991, at 1:30 a.m., he was outside his home at 6829 S. Perry, talking to his friend, Lethon Rogers. Fisher and Rogers talked for about 10 or 15 minutes and then started walking across the street. Fisher then saw a man whom he recognized as George Harrison slowly driving a black and gold Trans Am down the street. Fisher also saw defendant, whom he knew from the neighborhood, seated on the front passenger side of the vehicle. Fisher testified that he had also seen Harrison earlier that day in the Trans Am. Fisher and Rogers thought that it was suspicious that the Trans Am was moving at a pace of about five miles per hour and that the occupants seemed to be looking for someone. Fisher and Rogers therefore shouted a warning to friends Shawn, "Kango," Emma and Sheila.

At around 2 a.m., Fisher and Rogers met up with a friend, Leonard Smith, and as the three stood near the front of Fisher's and Rogers' homes, Fisher heard Kango say "Heads up," telling them to watch out. Rogers did not hear the warning, but Fisher looked around frantically before he heard a shot and then saw defendant firing a gun. The shooting occurred about five minutes after defendant and Harrison had slowly passed down the street. Defendant was in a standing position in the Trans Am, which had its t-tops open. The first shots Fisher saw defendant shoot were aimed at Shawn, Emma and Sheila, who were standing about 15 to 20 feet away from Fisher. Fisher, Rogers and Smith hit the ground. Defendant began shooting at them. Rogers and Smith began running. Two more shots were fired. Defendant shot towards Rogers and Smith, and defendant and Harrison sped off. Rogers them came running toward Fisher saying that he had been hit. Rogers died as a result of his injuries.

The following day, after hearing that Fisher had witnessed the shooting, Fisher's mother sent him to Washington, D.C. Fisher testified that he feared for his safety because defendant was a known drug dealer. Fisher lived in Washington, D.C., for six weeks prior to beginning college in Mississippi. Fisher returned to Chicago in May 1992 and learned that defendant and Harrison were to be tried for Rogers' murder. Fisher then spoke with prosecutors and subsequently testified at Harrison's trial. Fisher had been arrested on an unrelated charge following Harrison's trial. Although a person named Tim Hampton signed the bail bond receipt to release Fisher from jail on that charge, Fisher testified that he did not know anyone by that name at the address listed on the receipt.

Leonard Smith testified consistently with Fisher's testimony, although Smith testified that he did not see the persons inside the car. Smith admitted that he had a previous conviction for possession of a controlled substance with intent to deliver for which he received probation in 1992.

Detective John Halloran testified that defendant was arrested and the Trans Am was impounded. The fingerprints in the car were smudged and not suitable for comparison. Palmprints on the car's exterior did not belong to either defendant or Harrison. The owner of the car did not know defendant or Harrison and reported the car stolen three days before the shooting.

Donald Jenkins testified following his arrest for failure to respond to a subpoena. He testified that on April 19, 1993, two years after the shooting, defendant confronted him and told him in a threatening tone that neither he nor his daughter or grandson was to attend the trial. Jenkins refused to comply with this request, and defendant reached into his back pocket, pulled out a piece of paper and hit it against his hand. As defendant was walking away, he said that he should have "got" Buck (Fisher) first.

Jenkins admitted that he had pled guilty in 1988 to burglary, received probation, and was arrested in 1978 for the filing of a false police report, which he explained as a misunderstanding regarding his car and a friend who took the car without permission.

James Hollins testified on defendant's behalf that he was the owner of Good Rockin' Lounge at 6950 S. Wentworth in Chicago, which was located 2¹/₂ blocks from the crime scene. Defendant entered the lounge at 1 a.m. on May 29, 1991. Hollins' routine is to empty the bar at 1:45 a.m. so that he can close at 2 a.m. He did not know defendant's whereabouts between 1 a.m. and when he saw him outside the bar at about 2:15 a.m.

Steven Harris testified that he saw defendant at the lounge on the night of the shooting. Frank Holmes testified that he drank and shot pool with defendant at the lounge on the night in question, but they were not together the entire time. Holmes had pled guilty in 1991 to delivery of cocaine and in 1993 to possession of a controlled substance and unlawful use of a weapon by a felon. Phillip Mitchell testified that at around 2 a.m. he was in front of his mother's house at 6943 S. Wentworth, with defendant, who had been there since the lounge closed. A lady came by and said someone had been shot. Mitchell did not recall telling an investigator that he did not know defendant or anyone by that name or saying that he was not a witness to the shooting.

Cook County State's Attorney Investigator Thomas Shine testi-

fied in rebuttal that he had called Phillip Mitchell and Mitchell informed him that he did not know defendant and that he had not witnessed any shooting.

At the conclusion of this evidence, defendant was found guilty of first degree murder and sentenced to 50 years' imprisonment.

Defendant's first claim on appeal is that a *Batson* violation occurred when the State exercised peremptory challenges to dismiss four African-American veniremembers in a racially motivated manner. Defendant claims that the trial court hastily ruled that the defense had not established a *prima facie* case of discrimination, ordered the State to provide race-neutral reasons for its challenges, and then erroneously held that the proposed race-neural reasons were proper. When the defense raised its *Batson* claim, it stated that "[t]his is a pretty congenial group out there as far as their background, except for the people who lied to us." After naming the four African-American and one white venirepersons excused by the State, the trial court stated that "I am not going to find that a *prima facie* case has been made but I am going to ask the State to put their reasons on the record." After the State stated its reasons for exercising its challenges, the trial court stated that these were legitimate race-neutral reasons.

In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court outlined the procedure for determining whether the State used its peremptory challenges in a racially discriminatory manner. First, the trial court is to determine whether the defendant has made out a *prima facie* case of discrimination. If the trial court determines that the defendant has made a *prima facie* showing, the burden shifts to the State to provide legitimate race-neutral reasons for its use of peremptory challenges on African-American venirepersons. Lastly, the trial court must determine, in view of all of the relevant circumstances, whether the defendant has demonstrated the existence of intentional racial discrimination.

Defendant claims that the trial court did not follow the procedure set forth in *Batson*. Defendant claims that because the trial court hastily determined that he had not established a *prima facie* case of discrimination, asked the State to provide its explanations for its peremptory challenges, and then ruled on the validity of these explanations, the issue of whether a *prima facie* case had been established became moot and the only issue in this appeal is whether the court made a proper ultimate determination on the issue of racial discrimination.

In *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395,

405, 111 S. Ct. 1859, 1866 (1991), the Supreme Court held that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."

The Illinois Supreme Court has applied *Hernandez* and found that the *prima facie* issue is moot regardless of whether the trial judge prompts the State to present neutral reasons for exercising challenges or the State defends its use of peremptory challenges without any prompting by the court. *People v. Hudson,* 157 Ill. 2d 401, 626 N.E.2d 161 (1993). *People v. Mitchell,* 152 Ill. 2d 274, 604 N.E.2d 877 (1992).

Our case is similar to *People v. Thomas,* 266 Ill. App. 3d 914, 641 N.E.2d 867 (1994). In that case, the trial court stated that, although it did not believe that a *prima facie* case had been made, it believed that some panels of the appellate court might disagree and therefore asked the State to give its reasons for exercising its challenges. After the State gave its reasons, the trial court again stated that no *prima facie* case had been made and then discussed why it believed the State presented race-neutral reasons for striking the venirepersons. The appellate court determined that when the trial court ruled on the ultimate issue of purposeful discrimination, the issue of whether defendant established a *prima facie* case became moot. We reach the same conclusion here and, thus, need only address the ultimate issue of whether there was intentional discrimination.

■ The State claimed that it excused venireperson Ruth Ewing because defendants frequently turn themselves in to her husband, investigative reporter Russ Ewing. Sean McGee was excused because he spent two years of college as a criminal justice major and the State felt that he would be too sympathetic toward the defendant and possibly lead the jury down the wrong path. Willie Saffold was removed because the State was concerned he could not pay attention to detail since he could not remember his children's ages, he did not work and he answered questions incorrectly on his juror questionnaire. We agree with the trial court that these were valid reasons for exercising peremptory challenges.

However, we reach a different conclusion from the trial court on the State's excusal of Bertha White. The prosecutor claimed that he excused White because she "has a son approximately the defendant's age; we felt that she would be very sympathetic towards [defendant]." In order to satisfy the second prong of the *Batson* analysis, the prosecutor's explanation for excusing the venireperson need not be persuasive or even plausible. *Purkett v. Elem,* 514 U.S. 102, 131 L.

Ed. 2d 834, 115 S. Ct. 1769 (1995). However, the persuasiveness of the justification becomes relevant at the third stage of the *Batson* proceeding when implausible or fantastic justifications are likely to be found pretexts for discrimination. *Purkett*, 514 U.S. at 768, 131 L. Ed. 2d at 839, 115 S. Ct. at 1771.

The record here reveals that the prosecutor's explanation for excusing White because her son was "approximately" defendant's age was clearly pretextual. White's son was only 21 years old at the time of trial, while defendant was 36 years old. Furthermore, the prosecutor accepted other venirepersons with children closer in age to defendant. The prosecutor accepted a white juror whose son was in his late 20s. See *People v. Harris*, 129 Ill. 2d 123, 544 N.E.2d 357 (1989) (if a prosecutor strikes a minority venireperson for possessing certain characteristics but does not reject a nonminority juror who shares the same characteristics, there is a presumption that the prosecutor's explanations were pretextual). If the prosecutor truly did not want jurors with sons close to defendant's age, the white juror would have been the more logical venireperson to excuse. The State also accepted two African-American jurors whose sons were in their middle thirties. The fact that the sons of these two African-American jurors matched defendant's age more closely than White's son further underscores the fact that the State's reason for excusing White was pretextual.

The State claims that the prosecutor asserted two distinct reasons for excusing White, one, that her son was approximately defendant's age, and two, that the prosecutor believed that she would be very sympathetic to defendant. Our review of the prosecutor's explanation, quoted above, for excusing White reveals a link between her son's age and the prosecutor's belief that she would be sympathetic to defendant. The prosecutor was essentially stating that he believed White would be very sympathetic to defendant because she had a son close to defendant's age. The prosecutor offered no other reason for believing White would be too sympathetic toward defendant. However, White certainly would be no more sympathetic toward defendant than those chosen jurors with sons even closer to defendant's age. We therefore conclude that the State's explanation for dismissing juror White was pretextual, and for this reason we reverse defendant's conviction and remand for a new trial.

We address the following issues that may arise on remand, as well as the ineffective assistance of counsel claim, which would have been a basis for reversal even if there had been no *Batson* violation. We first turn to the issue of whether defendant should have been allowed to introduce testimony that the State's witnesses' belonged to

the same gang as the deceased. Although defendant was not a gang member, defendant claims that the State's witnesses' gang membership was relevant to show their bias in the form of sticking together and testifying consistently with each other, and to rebut the impression cultivated by the State that its chief witness, Anthony Fisher, was a well-behaved college student.

■ Defendants have a constitutional right to cross-examine witnesses for the purpose of showing bias, prejudice, or a motive to testify falsely. Ill. Const. 1970, art. I, § 8. While defendants are granted wide latitude in conducting cross-examination to show bias, a trial court may limit such an inquiry in order to avoid harassment, prejudice, confusion of the issues, repetitive or irrelevant testimony, or the introduction of remote or uncertain evidence. *People v. Jefferson*, 260 Ill. App. 3d 895, 631 N.E.2d 1374 (1994). A trial court's limitation of the defendant's attempt to show bias will be reversed only if the court abused its discretion, resulting in manifest prejudice to defendant. *Jefferson*, 260 Ill. App. 3d at 904.

■ In support of the admission of this gang evidence, defendant relies on *People v. Gonzalez*, 104 Ill. 2d 332, 472 N.E.2d 417 (1984), wherein the Illinois Supreme Court found that the trial court erred in preventing defendant from cross-examining a key State witness on his gang affiliation. In *Gonzalez*, the defendant had recently withdrawn from gang membership. The gang, and particularly the key witness testifying against defendant, had threatened to "get" defendant and his family if defendant did not renew his gang membership. The court found that evidence of the witness' gang membership should have been admitted at trial since the defense theory was that defendant was being framed and the witness had a motive to testify falsely either to "get" defendant or to avoid being implicated in the crime. Therefore, evidence of the witness' gang affiliation was relevant to the trial.

The instant case, however, bears more similarity to *People v. Jefferson*, 260 Ill. App. 3d 895, 631 N.E.2d 1374 (1994), where the witness' gang membership was excluded since it was completely unrelated to the crime and in no way relevant to the defense theory. In our case, defendant has not alleged that State witnesses had a motive to falsely accuse him. There was no evidence of any gang retaliation or gang rivalry. The issue of gangs is completely immaterial to the case and therefore properly excluded from trial. Furthermore, while defendant claims that the prejudicial impact of excluding Anthony Fisher's gang affiliation was heightened by the fact that the prosecution portrayed Fisher as a college student, the defendant brought into question Fisher's credibility by informing that jury that Fisher had been charged with a crime and was out on bail.

We next address whether defendant was denied effective assistance when his counsel: (1) informed the jury that defendant would testify, failed to investigate whether defendant had a prior conviction and attempted to explain to the jury why defendant did not testify; (2) failed to elicit the fact that the State's main witness, Anthony Fisher, had attempted murder charges pending against him; and (3) failed to take the steps necessary to prove up a statement by Fisher to defense counsel that he wanted help from the prosecutor. A defendant receives ineffective assistance of counsel if his counsel's performance was so deficient that his error deprived defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

■ In opening statement, the defense attorney informed the jury that they would hear from defense witnesses and defendant and that those people would testify that, at the time of the shooting, the defendant was at the Good Rockin' Lounge and was nowhere near the scene of the shooting. During the defense case, four witnesses testified as to defendant's whereabouts on the night of the shooting. Defense counsel intended to have defendant testify next but claimed that the State had surprised him by seeking to introduce a prior conviction of the defendant of which defense counsel was unaware. This prior conviction was a 1986 Montana guilty plea to two counts of criminal possession of a dangerous drug with intent to sell. The prosecutor informed the court that he had supplied defense counsel with certified copies of defendant's city, state, and federal "rap-sheets," which mentioned the Montana guilty plea. Defense counsel did not deny receiving these sheets, but argued instead that defendant's guilty plea was not a conviction because the plea could have been withdrawn by defendant under certain circumstances for a period of three years. The three-year period, however, had expired and the guilty plea was never withdrawn. After the trial court ruled that these were convictions, and that the prosecutor could introduce them if defendant testified, defense counsel decided to recommend to defendant that he not testify at trial. During closing argument, defense counsel attempted to explain to the jury why defendant did not testify by stating that, although they did not hear from defendant, they heard from defendant through the four witnesses who testified.

We find that defendant received ineffective assistance of counsel when his counsel informed the jury that defendant would take the stand, although he had not investigated or obtained a ruling on the admissibility of defendant's prior conviction, and then drew attention to the defendant's failure to testify, when he commented on such in

closing argument. The instant case is distinguishable from *People v. Schlager*, 247 Ill. App. 3d 921, 617 N.E.2d 1275 (1993), wherein defense counsel promised the jury that defendant would testify, but after becoming aware of defendant's credibility problem, decided not to put on a defense, but instead argue that the State had not proved its case beyond a reasonable doubt. The court in *Schlager* found this to be trial strategy, noting that counsel "did not exhibit a misunderstanding of the fundamental rules of civil procedure, nor did defense counsel fail to subject the State's witnesses to meaningful adversarial testing, nor did defense counsel's trial strategy contain flawed legal arguments." *Schlager*, 247 Ill. App. 3d at 932.

Our case bears more similarity to *People v. Lewis*, 240 Ill. App. 3d 463, 609 N.E.2d 673 (1992), wherein defense counsel told the jury in opening statement that defendant gave a pretrial statement that was exonerating. The court determined that counsel was ineffective in promising to produce such significant exonerating evidence, when such evidence was clearly inadmissible, and that the failure to fulfill such promise was highly prejudicial.

In the instant case, while counsel did present some exonerating evidence as to defendant's whereabouts at the time of the shooting, he did not present the most important piece of evidence he had promised to produce, defendant's testimony. The impact of a defendant's testimony and the weight given to such testimony by a jury is certainly greater than that of an ordinary witness. Furthermore, it was defense counsel's own failure to investigate defendant's plea or obtain a ruling from the court on whether the plea was a conviction, prior to opening statement, that caused his promise to the jury to be unfilled. This cannot be deemed trial strategy. Had the prosecutor been the one to comment on defendant's failure to testify, this clearly would have been prejudicial error. *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965). Here, defendant was prejudiced by his own counsel's emphasis on defendant's failure to testify. This error alone would have given us sufficient basis to reverse defendant's conviction.

■ Turning to defendant's next claim of ineffective assistance of counsel, we do not find that counsel was ineffective in failing to elicit the fact that the State's chief witness, Anthony Fisher, had attempted murder charges pending against him. Rather, we find this to be trial strategy. Had counsel introduced evidence of Fisher's pending attempted murder charges in order to show that Fisher's testimony was motivated by a desire to obtain favorable treatment from the State, the State would have elicited evidence from Fisher that, prior to being charged, he had testified at codefendant Harrison's trial con-

sistently with how he had testified at defendant's trial. Thus, defendant would have derived no benefit from defense counsel eliciting evidence of Fisher's charge.

■ Defendant also claims that his counsel was ineffective in failing to take the steps necessary to prove up a statement by Fisher to defense counsel during a pretrial interview that Fisher wanted help from the prosecutor on his pending charge for attempted murder. Fisher denied making this statement, and the trial court determined that defendant could only prove up this conversation if defense counsel disqualified himself and then became a witness at trial. Defense counsel instead chose not to prove up the conversation. The trial court then struck the question and answer regarding the conversation. It is our opinion that counsel's decision to remain in the case rather than withdraw can indeed be considered trial strategy.

■ Defendant also claims that the prosecutor made several improper comments in closing arguments. We agree and find that the following comments must not be repeated on retrial. The prosecutor improperly voiced his personal opinion and used the integrity of the State's Attorney's office when he commented that defense witnesses were the worst liars he had ever seen testify for a defendant. See *People v. Valdery*, 65 Ill. App. 3d 375, 381 N.E.2d 1217 (1978) (the prosecutor's repeated comments that the State's witnesses had the highest integrity and character he had ever seen were held to be highly prejudicial because they placed the integrity of the State's Attorney behind the witnesses).

The prosecutor also improperly implied that an expert cannot be cross-examined with another expert's prior diagnosis and shifted the burden of proof when he commented that the defense attacked the State's expert pathologist through cross-examination rather than by the defense presenting its own expert. An expert may be impeached with another expert's report (*People v. Silagy*, 101 Ill. 2d 147, 461 N.E.2d 415 (1984)), and the defense had no obligation to call any witnesses.

The prosecutor also improperly argued facts not in evidence when he stated that the Trans Am owner's fingerprints were not found in the car and that Fisher had stated at a previous trial that defendant was the shooter. We also note that the prosecutor improperly showed extreme disdain for the defense by stating in closing argument, "[t]his is how worthless this piece of paper is," and crumpling up a defense exhibit which the court had admitted into evidence.

Finally, we note that if defendant is again found guilty, the trial court can consider as an aggravating factor the force employed and

the manner in which the crime was committed, but it must not consider that defendant's conduct caused serious harm, since this is inherent in the offense of murder. *People v. Saldivar*, 113 Ill. 2d 256, 497 N.E.2d 1138 (1986).

Accordingly, for the reasons set forth above, defendant's conviction is reversed and this cause is remanded for a new trial.

Reversed and remanded.

GORDON, J., concurs.

JUSTICE HOURIHANE, dissenting:

The majority concludes that the State's explanation for excusing veniremember Bertha White was "clearly pretextual" and thus necessitated the reversal of the defendant's conviction and sentence. In reaching this conclusion, the majority notes that, when asked to proffer a basis for his challenge of Ms. White, the prosecutor indicated that he was challenging her because she had a son approximately the defendant's age[1] and he felt that she would be sympathetic toward the defendant. The majority then concludes that this reason was "clearly pretextual" because a white member of the jury who also had a son approximately the defendant's age was not challenged by the State.

I respectfully disagree for the reasons that follow. First, the courts of this state have repeatedly recognized that the State may legitimately exercise a peremptory challenge to exclude a prospective juror because he or she has children of an age close to the defendant's. See *People v. Andrews*, 155 Ill. 2d 286 (1993); *People v. Lovelady*, 221 Ill. App. 3d 829 (1991); *People v. Baisten*, 203 Ill. App. 3d 64 (1990); *People v. Batchelor*, 202 Ill. App. 3d 316 (1990). Accordingly, there is nothing inherently suspicious or pretextual about the State offering such a reason for excluding a potential juror.

Second, it would be improper for us to assume, as the majority does, that the trial court erred in finding an absence of discriminatory intent merely because the State accepted a white juror who possessed a similar characteristic. As our supreme court stated in *People v. Wiley*, 165 Ill. 2d 259 (1995):

> "In reviewing the reasons given by the State, it is necessary to bear in mind that ' "in many instances there will be no single criterion that serves as the basis for the decision whether to excuse a

---

[1]The record indicates that at the time of the trial the defendant was 36 years old and Ms. White had children ages 25 and 21.

particular venireman." ' (*People v. Mitchell* (1992), 152 Ill. 2d 274, 295, quoting *People v. Mack* (1989), 128 Ill. 2d 231, 239.) The State's purposeful discrimination is not automatically established by the mere coincidence that an excluded juror shared a characteristic with a juror who was not challenged. The excluded juror may possess an additional trait that caused the State to find him unacceptable, while the juror who was not challenged may possess an additional characteristic that prompted the State to find him acceptable to serve as a juror. [Citation.] '[A] peremptory challenge is based on a combination of traits, and a juror possessing an unfavorable trait may be accepted while another juror possessing that same negative trait, but also possessing other negative traits, may be challenged.' *Mitchell*, 152 Ill. 2d at 295." *People v. Wiley*, 165 Ill. 2d at 282-83.

In this case, the State did not challenge white veniremember Angelo Baez though he also had a son close to the age of the defendant. While this fact may raise an inference of purposeful racial discrimination, such is not dispositive. *People v. Mack*, 128 Ill. 2d 231 (1989). The record reveals that at least three members of the actual jury had children close to the defendant's age. Mr. Baez, a white resident of the north side of Chicago was married and had a 28-year-old son who was serving two years in prison for auto theft. Mr. Burns was a black, married resident of the south side of Chicago who worked as a Baptist pastor and had two children in their mid-thirties. Mr. Randle, a black, divorced resident of the west side of Chicago, worked for the city and also had children near the age of the defendant.

In order to conclude that the prosecutor's failure to challenge these other similarly situated parents evinced a discriminatory intent, you must ignore the second part of the reason identified by the prosecutor for challenging White, as well as the race of those similarly situated but not challenged. The prosecutor stated that he challenged Ms. White because she had a child close to the defendant's age *and* because he believed that she would be sympathetic toward the defendant. While the prosecutor did not elaborate on his reasons for believing that White would have been sympathetic, peremptories are intended to permit rejection for real or imagined partiality that is not easily designated or demonstrable. *Swain v. Alabama*, 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824 (1965). This is true even in the context of a *Batson* determination. *People v. Munson*, 171 Ill. 2d 158 (1996). Moreover, the fact that the prosecutor did not challenge two black members of the venire with children near the age of the defendant supports the conclusion that the prosecutor did not challenge Ms. White based on her parental status as a pretext for discriminating based upon race. Rather, this fact seems to suggest, as the trial

court found, that the prosecutor honestly believed that Ms. White would have been more sympathetic than other parents who were not challenged.

Unless a discriminatory intent is inherent in the reason proffered by the State, the reason is sufficient to sustain the State's burden at the second stage of a *Batson* proceeding regardless of whether or not the explanation makes any sense. *Purkett v. Elem*, 514 U.S. at 768—69, 131 L. Ed. 2d at 839-40, 115 S. Ct. at 1771. The question then becomes whether the defendant has succeeded in proving intentional discrimination. *Purkett v. Elem*, 514 U.S. 765, 131 L. Ed. 2d 834, 115 S. Ct. 1769 (1995). In making this determination, the court should look to the totality of the relevant facts. *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991).

Here, the majority has failed to focus upon the totality of the circumstances as it pertains to the prosecutor's motive and instead focused upon the reasonableness of the explanation proffered. While the record indicates that the State used four of the six, or 66% of, peremptory challenges exercised to dismiss black members of the venire, this fact alone is not sufficient to establish intentional discrimination. See *People v. Henderson*, 142 Ill. 2d 258 (1990); *People v. Anderson*, 266 Ill. App. 3d 947 (1994); *People v. Dukes*, 227 Ill. App. 3d 988 (1992). Moreover, the record further reveals that at least four members of the jury were black; a fact that militates against a finding of intentional discrimination. *Anderson*, 266 Ill. App. 3d 947. The absence of additional information in the record regarding the racial composition of the venire as a whole and other relevant circumstances is construed against the defendant, who has the burden of preserving a record. *Henderson*, 142 Ill. 2d at 279-80.

A court of review must remain mindful that a trial court's determination of whether the defendant has established purposeful discrimination is a finding of fact which should not be overturned unless it was clearly erroneous. *People v. Ramey*, 151 Ill. 2d 498 (1992); *People v. Hope*, 147 Ill. 2d 315 (1992). Because the record in the present case does not support such a conclusion, I respectfully disagree.

Moreover, I disagree with the majority's finding that trial counsel provided ineffective assistance that would also justify the reversal of the defendant's conviction. The majority concludes that trial counsel's failure to present the defendant as a witness after indicating that he would do so in opening statement, combined with counsel's later reference to this failure, served to prejudice the defendant and would have provided an independent basis for the reversal of the defendant's conviction. While it is true that counsel should have requested a ruling on the admissibility of the defendant's prior conviction prior to

opening statement, this error was not prejudicial. As this court noted in *People v. Schlager*, 247 Ill. App. 3d 921, 932 (1993), the test is not whether counsel kept all the promises made during his opening statement, but whether his errors were so serious that in their absence the result of the trial would have been different. Viewed under the applicable standard, the errors committed by trial counsel do not warrant the reversal of the defendant's conviction.

Similarly, the other errors identified by the majority regarding prosecutorial misconduct do not constitute grounds for reversal.

For the foregoing reasons, I respectfully dissent.