# Illinois Official Reports

## Appellate Court

---

### *People v. Talbert*, 2018 IL App (1st) 160157

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH TALBERT, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-16-0157 |
| Filed | December 4, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-5124; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Stephanie T. Puente, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAVIN delivered the judgment of the court, with opinion. Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion. |

¶ 1    Following a jury trial, defendant, Keith Talbert, was found guilty of the first degree murder of Antonio Johnson, the attempted first degree murder of Annette Johnson, and the aggravated discharge of a firearm in the direction of Anthony Wardlow. Defendant received a cumulative sentence of 100 years in prison. On appeal, defendant asserts that the trial court abused its discretion by permitting the jury to hear evidence of prior bad acts committed by his cousin, Richard Talbert, just weeks before the shooting. Defendant also contends that trial counsel was ineffective where counsel promised, but did not deliver, testimony identifying a different perpetrator. For the following reasons, we affirm the trial court's judgment.

¶ 2                                    I. Background

¶ 3    In 2011, Annette lived with her sons Antonio and Anthony at 732 North Springfield. Antonio was a 15-year-old high school student, and Anthony had recently been released from prison, where he served a sentence for aggravated robbery. The State's theory at trial was that animosity existed between the Johnson-Wardlow family and defendant's cousin Richard because the family opposed Richard's activity as the neighborhood drug dealer. In addition, the trial court granted, over defendant's objection, the State's motion *in limine* to present evidence of Richard's prior interaction with the Johnson-Wardlow family. According to the State, on the afternoon of September 25, 2011, Richard instructed defendant to shoot members of the family.

¶ 4    In contrast, defendant asserted that he had been misidentified as the shooter. His trial counsel gave the following opening statement:

    "We'll present you with four witnesses. Three witness who were standing exactly in front of the house when the shooting took place. Two of these witnesses actually grew up with Antonio and were friends of his. Two of these witnesses actually saw the car and looked at the face of the shooter as this event took place.

                                    * * *

    They decided to come here for this trial in order to prevent the loss of two lives, Antonio and [defendant] himself."

¶ 5    At trial, Ashley Wardlow, Annette's daughter, testified that on September 25, 2011, she drove Annette to the grocery store. When they returned to Annette's home, the two women, Antonio, and Anthony unloaded groceries. No one else was in front of the house or across the street at that time.

¶ 6    From inside the house, Ashley heard four or five gunshots. One bullet came through the window. Annette was shot in the arm, and Antonio lay unresponsive on the porch, bleeding through his nose and mouth. After Ashley called 911, Annette and Antonio were taken to the hospital, and Ashley spoke to police officers at the scene. Ashley testified that Antonio had no problems with anyone in the neighborhood but Anthony had problems with Richard. That being said, Ashley also testified that she did not know if Anthony, Annette, or Antonio had problems with defendant.

¶ 7    Anthony testified that in 2011, boys who were 17 years old or younger regularly sold drugs in front of his family's home. Richard wanted Anthony to sell drugs for "them," apparently referring to Richard and his fellow gang members, but Anthony declined. At some point,

Annette was in a store when Richard indicated he was going to harm Anthony. In addition, Richard was in front of Annette's house in early September 2011 when he threatened to burn it down. Defendant was not present for that threat. Hours later, another individual set the home ablaze. Meanwhile, drug sales continued in front of the house.

¶ 8 On September 25, 2011, Anthony and Antonio were waiting outside the house for Annette and Ashley to come home with groceries. Defendant, who had short dreadlocks and went by the nickname Kee-Kee, drove by in a cream or beige Cadillac. Anthony had seen defendant around the neighborhood but did not know his name at that time. Richard was sitting in the passenger seat of the Cadillac. Richard pointed to Anthony and appeared to say to defendant, "that bitch-ass nigger right there." Defendant looked at Anthony and "[s]hook his head, like I got you." After the Cadillac left, Annette and Ashley returned home. The Cadillac returned as well, however, only five minutes after it had left. Now alone in the car, defendant yelled, "hey, Anthony, get your bitch-ass out here." Anthony then looked at defendant, who pointed his gun out the car window and fired five or six shots, striking Antonio in the head and Annette in the arm. Antonio subsequently died.

¶ 9 Later at the scene, Anthony described the incident and the perpetrator for the police. Although Anthony originally testified that he was not paying attention to whether defendant's dreadlocks were dyed, Anthony subsequently acknowledged telling the police that the tips of defendant's dreadlocks were brown. Anthony also related the family's problem with drug sales outside their home. The next day, Anthony identified defendant as the shooter from a photo array and similarly identified Richard from a photo array. Anthony identified defendant from a lineup in February 2012, although he looked somewhat different at that time.

¶ 10 Annette testified that when she learned that Richard had sent teenagers to sell drugs in front of her house and hide drugs in her shrubs, she asked Richard to stop them. The situation did not change, prompting Annette to call 911 whenever she saw drug dealers outside. At some point, she began providing information to Detective James Sajdak and allowed the police to do surveillance from her attic. Detective Sajdak's own trial testimony confirmed this. Additionally, Annette testified that Richard repeatedly came over to speak to Anthony, who wanted nothing to do with Richard. Moreover, Annette testified that in early September 2011, Richard and an associate of his had words with Anthony outside their house. Richard was angry and exclaimed, "burn the bitch." Hours later, her house was set on fire while the family was home. Annette did not see Richard at the time of the fire.

¶ 11 As to the day of the shooting, Annette testified that when she and Ashley returned home, Antonio, Anthony, his girlfriend, and Annette's cousin were there. Anthony was talking with Antonio and Annette on the porch when a young, brown-skinned man with dreadlocks and a scar on his eyebrow approached in a car. In court, Annette identified that young man as defendant and testified that she had not seen him before. He yelled, "Anthony, with your bitch ass," and fired five or six shots at them. Annette froze after being shot in the arm. When another shot was fired, she dove to the side of the porch where Antonio fell on her.

¶ 12 Afterward, Annette said she had been shot in the arm and told Antonio to get off of her. When Annette pulled herself out from underneath him, she saw a trickle of blood run down the side of his neck. Anthony told him not to move while Ashley called 911. At the hospital, Annette told Detective David March what she had seen. She also said that the vehicle was light in color, possibly grey or beige, but she was not entirely sure. Annette further testified that she mentioned the problem of drug sales in front of her house. She identified defendant from a

photo array the next day and identified him from a lineup in February 2012, although he no longer had dreadlocks. When the bullet later fell out of her arm, she gave it to Detective March.

¶ 13 Detective March testified that at the scene, he spoke to Anthony, who described the offender as a black male in his twenties and approximately six feet, one inch tall, with a medium complexion. According to Anthony, he had black dreadlocks with brown tips. Anthony said he had seen the offender in the neighborhood several times but did not know his name. Anthony later said his nickname was Kee-Kee. According to Anthony, the offender was driving an older cream-colored, four-door Cadillac and that he fired eight or nine times from the car. While the offender was alone in the car at the time of the shooting, the offender had driven by the house with a black male named Richard shortly before the shooting. Anthony added that his family had ongoing tensions with individuals who were selling drugs on their block, including Richard.

¶ 14 At some point, Detective March interviewed Annette, who recalled three or four shots and believed the car was light colored or grey. Annette did not report having personal problems with defendant. Detective March also testified that not many people were at the scene when he arrived and no other witnesses came forward. Officer Matthew Gordon similarly testified that only family members provided information at the scene. According to Officer Gordon, it was not easy to get witnesses to come forward in this area.

¶ 15 Detective Patrick Deenihan testified that, shortly after the shooting, he went to the hospital and learned that Antonio was in critical condition with a gunshot wound to his head. He then spoke with Annette, who gave a detailed description of the shooting. She said the offender was a thin, black male of medium complexion who wore his hair in dreadlocks. According to Annette, he was driving a grey-colored vehicle and she heard three or four shots. She did not relate any prior issues with the offender.

¶ 16 The next day, Detective Deenihan learned from Anthony and Annette that they recently had problems with drug dealers in the community. They also said that Officer Sajdak had arrested someone connected to the individual who had been in the car with the offender. Upon the detective's inquiry, Officer Sajdak said he had not arrested anyone but had made contact with certain individuals, including Darryl Talbert. Darryl was associated with 521 North Springfield and when Detective Deenihan searched that address in the police database, he found that many individuals, including Richard, had also used that address. The detective stated, "That all fit based on the address, 521 North Springfield, first name Richard, last name Talbert." Additionally, defendant was associated with that address and his photograph was consistent with Annette and Anthony's description of the shooter. Anthony and Annette subsequently identified defendant as the shooter from a photo array. From another photo array, Anthony identified Richard as the person with defendant in the vehicle shortly before the shooting.

¶ 17 The evidence showed that the police informed the Department of Revenue that it was looking for information concerning a 2000 Cadillac STS with the license plate L955943. The police learned from the department on October 17, 2011, that the vehicle was last seen at 4852 North Krueger Avenue. The police then had the vehicle towed for processing. We note that photos of the vehicle showed it was actually white. Ellen Chapman testified that while the gunshot residue kit collected from the car revealed no gunshot residue, particles could effectively be removed by wiping or washing a surface. Moreover, firearms examiner Jennifer Hanna determined that a bullet jacket and two bullets fired in this incident came from a

.38-caliber class firearm. Defendant was arrested in Milwaukee on January 24, 2012, and was transported to Chicago approximately two weeks later.

¶ 18   Anna Ngyuen testified that defendant was her husband but they were separated. She also knew Richard, who was defendant's cousin. In 2011, she purchased a 2000 Cadillac STS from a friend. Both she and defendant drove it but they had just one set of keys, which defendant controlled. She did not see the Cadillac or defendant on September 25, 2011.

¶ 19   When the State rested its case, trial counsel presented the testimony of four witnesses on defendant's behalf. It is undisputed that they did not testify in the manner that counsel had promised the jury they would testify.

¶ 20   Darrin Murdock testified that on the afternoon of the shooting, she said hello to Antonio when passing his house but did not see Annette there. Murdock continued walking and was around the corner when the shooting began. According to Murdock, she "really couldn't see anything." Although Murdock saw a gray/silver vehicle, she did not see the person driving it. Murdock had seen defendant in the neighborhood but did not know him. Furthermore, Anthony was known for having a bad attitude but Antonio was a good person. Murdock left before the police arrived. She denied being reluctant to speak to defense counsel.

¶ 21   Nicole Payton, Murdock's mother, testified that she and her daughter, Khadija Ricks, were walking home from the store and saw Antonio sitting on the porch with his mother and his friend Tyler. Anthony was standing in the doorway. Two to three minutes after seeing them, the shooting occurred. Payton ducked down by the trees and saw a red car go by. She was not sure whether she saw that car before or after the shooting, however. Payton then ran home and did not speak to the police. She had no problem with defendant and did not see him on the day of the shooting. She knew of Richard but did not specifically know him. Furthermore, she had no problem with Anthony, although he was argumentative.

¶ 22   Ricks testified that she was a friend of Antonio. Ricks was walking with Payton when she saw Antonio, Tyler, and Annette on the porch. Anthony was standing in the doorway. Ricks and Payton continued walking and crossed paths with Murdock. When the shooting occurred, Ricks ran straight home without looking back or seeing the shooter. She did not recall whether she saw any cars drive by. Furthermore, she did not come forward to talk to the police because she was scared of Anthony. While Ricks personally had no problem with Anthony, he was always angry. Ricks knew defendant but did not associate with him or see him on the day of the shooting. She also knew who Richard was but did not personally know him.

¶ 23   According to Lukeba Wright, the shooting occurred when she was at a bus stop. She got down on the ground and saw a dark grey vehicle pass by. When asked why she did not try to talk to the police, she responded, "For what? I ain't dealing with that." Wright was reluctant to come to court and did not know Antonio, Anthony, or defendant.

¶ 24   In closing, defense counsel argued:

"As a defense[,] we did bring forth some witnesses. They were not, they didn't really want to be here, to keep it frank. Now the State did bring up why did it take them three years to come forth and give testimony.

* * *

Matthew Gordon, the first police officer to take the stand, said in his seven years on the force, people are not forthcoming in that neighborhood to come forward and give

- 5 -

evidence. They shied away from problems, they shied away from anything that was involved with the police or the court.

He also said when he came there, his job was to push people away from the crime scene. Which is what he did. And the people after they had been shot, after the shooting went down, they ran, everyone went in their own direction. One of our witnesses said she got on the bus and went home. Three other witnesses said they went home.

We had a young lady named Darrin, she was on the stand. She wasn't the most articulate person in the world, but she was doing her best. She was sure Antonio Johnson was a friend of hers, she was sure she saw him that day. She was sure when she got to the corner of Chicago Avenue she heard shooting and saw a gray car come by.

Furthermore, you have her mother and sister, who walk in the opposite direction when the shooting occurred. They didn't see anything. They didn't see [defendant], they didn't see the car. They ducked for cover."

Additionally, defense counsel argued it was important that witnesses saw a "gray" car because the police processed a cream colored car, which tested negative for gunshot residue. Counsel further argued that defendant did not have a scar on his eyebrow.

¶ 25    The jury found defendant guilty of first degree murder, attempted first degree murder, and aggravated discharge of a firearm. Subsequently, defendant obtained new counsel and filed a motion for a new trial. Defendant challenged, among other things, the admission of prior bad acts that involved Richard but not defendant. Furthermore, defendant argued that trial counsel was ineffective for failing to present the testimony promised in his opening statement. The trial court denied defendant's motion and subsequently sentenced him to 44 years in prison for murder and an additional 25-year enhancement for personally discharging a firearm. That 69-year term was to be served consecutively to his 31-year sentence for attempted murder and concurrently with his 15-year sentence for aggravated discharge of a firearm.

¶ 26                                                    II. Analysis
¶ 27                                          A. Richard's Prior Bad Acts
¶ 28    On appeal, defendant asserts the trial court erroneously admitted evidence that Richard threatened the Johnson-Wardlow family weeks before the shooting in question. The trial court's evidentiary rulings will not be disturbed absent an abuse of discretion. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 12. Additionally, reviewing courts will find an abuse of discretion only where the trial court's decision was fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it. *Id.* Conversely, no abuse of discretion will be found where reasonable minds could differ about the admissibility of the evidence. *People v. Heller*, 2017 IL App (4th) 140658, ¶ 55.

¶ 29    Defendant argues that the trial court abused its discretion because the State presented no evidence that defendant participated in or knew about the prior incident. He also argues that prejudice outweighed any probative value of the evidence because it portrayed Richard, rather than defendant, as a violent person. As pertinent precedent, we follow *People v. Pikes*, 2013 IL 115171.

¶ 30    There, the defendant was charged with the murder of Lorne Mosley. The State sought to admit evidence that shortly before Mosley's murder, the codefendant and other fellow members of the Four Corner Hustlers engaged in a shooting. In the prior incident, Gangster

Disciples drove through the Four Corner Hustlers' territory and the codefendant shot at one. Another Gangster Disciple then drove into the codefendant, however. There was testimony that the driver was later with Mosley when he was shot. Furthermore, the defendant and his codefendant made statements indicating they intended to seek revenge. *Id.* ¶¶ 3, 5, 7, 8.

¶ 31 While the trial court found the prior shooting was admissible in defendant's trial for Mosley's murder, the appellate court disagreed, citing concerns involving the admission of "other-crimes" evidence. The supreme court sided with the trial court. *Id.* ¶¶ 2, 3, 15, 28.

¶ 32 The supreme court observed that other-crimes evidence is admissible where relevant for any purpose other than to show the defendant's propensity to engage in crimes, such as to show motive or intent. *Id.* ¶ 11. Yet, the State must show that the defendant committed or participated in the commission of the crime. *Id.* ¶ 15. The *Pikes* court found that while permitting the jury to hear evidence of a defendant's other crimes might lead the jury to convict him for being a bad person, that concern is absent when the State seeks the admission of evidence of an uncharged crime committed by someone else and the State need not show that the defendant committed that crime. *Id.* Simply put, a crime committed by someone other than the defendant is not "other-crimes evidence." See *id.* ¶¶ 16, 20. Because the defendant was not alleged to have been involved in the prior incident, the supreme court applied ordinary relevance principles. *Id.* ¶ 20.

¶ 33 The supreme court found the evidence showed that defendant was motivated to help the codefendant retaliate for his injury, rejecting the notion that the jury did not need to hear that the codefendant shot at a rival gang member. *Id.* The shooting explained that the codefendant was not a randomly struck bystander and it would be illogical to uncouple the prior shooting from the codefendant being hit by a car. *Id.* In addition, the evidence carried no inference of guilt by association, as the evidence showed the defendant was not at the prior shooting. *Id.* ¶ 25. The probative value of this evidence far outweighed any prejudice. *Id.* ¶ 26.

¶ 34 The *Pikes* decision directly refutes defendant's contention that his absence from the arson threat and subsequent arson attempt rendered that evidence inadmissible. Rather, his absence renders principles governing other-crimes evidence inapplicable. Moreover, *Pikes* shows that any potential prejudice in admitting the evidence was ameliorated by his absence in the prior event. Defendant nonetheless contends the evidence was inadmissible because the State presented no evidence that defendant was aware of the arson incident. In response, the State argues that *Pikes* did not impose a knowledge requirement. We observe, however, that *Pikes* had no reason to consider whether a defendant must always know of a third person's prior bad act for it to be admissible, as the evidence there showed the defendant did know about the prior incident. Notwithstanding this distinction, *Pikes* guides our determination.

¶ 35 The supreme court has determined that relevance controls our inquiry. Thus, where evidence of a prior incident would not be relevant without the defendant's knowledge of it, the State may be required to show that the defendant had such knowledge. Where evidence of a prior act is relevant regardless of the defendant's knowledge, however, we find no purpose would be served by imposing a knowledge requirement. Accordingly, we must determine whether the arson incident was relevant absent evidence of defendant's awareness.

¶ 36 Illinois Rule of Evidence 402 (eff. Jan. 1, 2011) states that "[a]ll relevant evidence is admissible, except as otherwise provided by law." In contrast, irrelevant evidence is inadmissible. *Id.* To be relevant, evidence must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Even relevant evidence may be excluded where the danger of unfair prejudice, confusion, or delay substantially outweighs the evidence's probative value. Ill. R. Evid. 403 (eff. Jan. 1, 2011). The same is true where the danger of misleading the jury substantially outweighs the probative value. *Id.*

¶ 37        We find the evidence involving Richard's prior interactions with the Johnson-Wardlow family was relevant in this case, regardless of defendant's knowledge. Motive is not an element of murder but evidence tending to show that the defendant had a motive for killing the decedent is relevant, as such evidence renders it more probable that the defendant was the individual who killed the decedent. *People v. Smith*, 141 Ill. 2d 40, 56 (1990). To be competent, evidence of motive must, at least minimally, tend to demonstrate the motive alleged by the State. *Id.* Furthermore, "[t]he motive must be attributable to the defendant on trial at the time the [present] crime was committed." *Id.* at 57. This rule avoids the danger that the State will present the jury with highly inflammatory matter that is of little or no probative value under the guise of motive. *Id.*

¶ 38        Anthony testified that minutes before the shooting, defendant drove by with Richard, who pointed to Anthony and was heard to say, "that bitch-ass nigger right there." Contrary to defense counsel's representation at oral argument, Richard, rather than defendant, pointed at Anthony. This supports an inference that Richard ordered defendant to do something to Anthony. A jury could also infer from Anthony's testimony that defendant, by gesturing with his head, had agreed to do Richard's bidding. Furthermore, a jury could infer from defendant's subsequent actions that Richard had instructed him to fire at Anthony. This clearly supports a finding that defendant was complying with his cousin Richard's order to shoot at the Johnson-Wardlow family. Thus, we categorically reject defendant's assertion that "the State presented no evidence from which the jury could infer that [defendant] was motivated by any desire to further the purposes of, or to seek vengeance on behalf of his cousin, Richard."

¶ 39        Moreover, evidence of the prior arson threat and attempt were necessary to explain why Richard would order defendant to fire at the family. Stated differently, *Richard's* motive was relevant here too, not just defendant's motive. *Cf. Smith*, 141 Ill. 2d at 56 (stating that when the State attempts to prove facts constituting a motive, the State must show that the defendant knew of those facts). Richard's prior interactions with this family made it more probable that he would instruct defendant to shoot at the family in this case and made it more probable that defendant shot at the family. Without such evidence, the shooting would be essentially inexplicable.

¶ 40        Defendant acknowledges on appeal that, "[t]he testimony of Richard's drug sales, his threats to the Johnson-Wardlow family, and the arson case may well have been probative of whether [defendant] had a motive to kill—but only if the evidence had been somehow tied to [defendant.]" Based on defendant's interaction with Richard minutes before the shooting, a jury could surely find that the arson incident was tied to defendant. Accordingly, we find the evidence was relevant and properly admitted.

¶ 41        In reaching this decision, we reject defendant's reliance on *People v. Lopez*, 2014 IL App (1st) 102938-B, ¶¶ 6, 23-24. There, the reviewing court found *Pikes* to be distinguishable because there was no evidence that the murder at issue, committed against a worker at a factory, was connected to a prior attack on a different individual outside that factory. While the defendant's codefendants had been involved in the prior attack, that attack did not demonstrate

- 8 -

that they had animosity toward the factory workers or a motive to commit the otherwise inexplicable present offense. *Id.* ¶ 24. The court stated that "[w]hile it is possible that revenge was a motive, *absent any evidence*, the State's assertion rests on pure conjecture." (Emphasis in original.) *Id.* But see *People v. Morales*, 2012 IL App (1st) 101911, ¶ 28 (finding, in the codefendant's appeal from the same case as in *Lopez*, that the State's theory that the men killed the factory worker in retaliation for sheltering the victim in the first attack explained the murder at hand). Furthermore, the court distinguished *Pikes* on the basis that witnesses therein had heard the defendant and codefendant indicate that they wanted to kill a rival gang member in revenge for the prior incident, whereas the State presented no evidence in *Lopez* to show that the second crime was retaliation for the first or that the two crimes were otherwise related. *Lopez*, 2014 IL App (1st) 102938-B, ¶ 24. Moreover, *Lopez* found there was no evidence that the defendant knew about the prior incident. *Id.*

¶ 42 Unlike *Lopez*, here the State presented specific evidence that defendant was doing Richard's bidding. Thus, Richard's motive was important, regardless of whether defendant was aware of it. In these circumstances, defendant did not need to know about the prior conflict between Richard and Anthony in order to for those incidents to be relevant. *Cf. People v. Moreno*, 238 Ill. App. 3d 626 (1992) (where there was no suggestion that the defendant was acting at his codefendant's direction and where intent, rather than identity was at issue, the prior fight between the codefendant and victim was not relevant absent evidence that the defendant knew about the fight).

¶ 43 We also find *Smith* to be distinguishable. There, the State's theory of motive was that the defendant murdered a prison guard on behalf of the King Cobras' leader due to the guard's intolerance of gang activity, but there was no evidence that the defendant was an active member of the King Cobras or that he was acting on behalf of the gang or its leader. *Smith*, 141 Ill. 2d at 58-59. Additionally, the evidence did not suggest that the defendant knew the gang leader harbored animosity toward the guard. *Id.* at 59. "The only evidence even arguably tending to tie the alleged motive to defendant was the testimony that defendant had been seen, on certain occasions, in the presence of [the gang leader]." *Id.* The supreme court found the evidence was "simply too slim a thread upon which to tie the State's theory of motive." *Id.*

¶ 44 Unlike *Smith*, the State presented evidence supporting a finding that defendant was acting on Richard's behalf.

¶ 45 As stated, evidence of the prior arson incident was relevant to Richard's motive and, circumstantially, to defendant's motive. Any prejudicial effect did not outweigh the probative value of the evidence. The evidence had great probative value given that it explained an otherwise inexplicable shooting. Conversely, the risk of unfair prejudice was slight, as the jury was well aware that Richard, to the exclusion of defendant, was involved in the prior threat against the Johnson-Wardlow family. There is little, if any, risk that the evidence would lead the jury to convict defendant for being a bad person rather than for his conduct in the present offense. Moreover, the prosecutor's reference to Richard's prior acts in closing argument did not render the evidence any more prejudicial, particularly considering that both Anthony and Annette identified defendant as the shooter. We reiterate that the prosecutor's arguments were relevant to explain why Richard would have ordered defendant to fire shots on the day in question. *Cf. People v. Dukes*, 12 Ill. 2d 334, 342-43 (1957) (finding it was "improper for the prosecutor to do or say anything in argument the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant *without throwing any light on*

*the question for decision*" (emphasis added)).

¶ 46                                    B. Ineffective Assistance of Counsel

¶ 47    Next, defendant asserts that trial counsel was ineffective because his opening statement promised the jury it would hear exonerating testimony from four witnesses in support of defendant's mistaken identity theory but he failed to present such evidence.

¶ 48    To demonstrate that counsel was ineffective, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) but for counsel's errors, there is a reasonable probability that the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Peterson*, 2017 IL 120331, ¶ 79. The failure to satisfy either prong defeats an ineffective assistance of counsel claim. *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 49    To establish that counsel's performance was deficient, a defendant must demonstrate that his performance was objectively unreasonable under prevailing professional standards. *People v. Veach*, 2017 IL 120649, ¶ 30. In addition, defense counsel's errors in judgment or mistakes in strategy do not alone establish that his representation was constitutionally defective. *Peterson*, 2017 IL 120331, ¶ 80. Rather, ineffective assistance of counsel will be found only if counsel's strategy was so unsound that he entirely failed to meaningfully test the State's case. *Id.* In assessing counsel's strategy, we must not use hindsight. *Id.* ¶ 88.

¶ 50    Defense counsel may be ineffective where he promises the testimony of a particular witness during opening statements but does not provide that promised testimony at trial. *People v. Bryant*, 391 Ill. App. 3d 228, 238 (2009). That being said, defense counsel's failure to present the testimony promised during his opening statement does not constitute *per se* ineffective assistance. *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 20. His decision to abandon a strategy during trial may be reasonable based on the circumstances or based on unexpected events. *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 138. Reviewing courts must indulge a strong presumption that counsel's action resulted from sound trial strategy. *Bryant*, 391 Ill. App. 3d at 238.

¶ 51    At the hearing on defendant's motion for a new trial, the following colloquy ensued:

"MR. FINE [(POSTTRIAL COUNSEL)]: [Trial counsel] did call witnesses, but they did not support what the defense attorney promised the jury during opening statement.

THE COURT: He got flipped.

MR. FINE: I'm not sure if he got flipped or whether he just never spoke with those witnesses.

THE COURT: Is it ineffective assistance of counsel if the lawyer gets flipped by a witness? By flipped, so the record is clear, I'm referring to where witnesses tell lawyers in preparation for testimony one thing, they get on the witness stand and they say something differently. Does that mean the counsel is ineffective if that happens?

MR. FINE: Judge, I recognize that happens on a regular basis. But I think that—

THE COURT: It happens to the State's Attorney all the time.

MR. FINE: All the time. But, Judge—

THE COURT: It happens to the defense around here too.

MR. FINE: Absolutely. It's happened to all of us. But I think that, number one is, I'm not confident that he interviewed these witnesses, and I have nothing to substantiate that with. But he should have had an investigator or a third party—

THE COURT: Did you talk to those people?

MR. FINE: I've tried to reach out to the attorney to get their contact information.

THE COURT: If he had said—If they had said something different consistent with what he told the jury he expected the evidence to show, what they said to other people even if there was a prover [*sic*] present, that wouldn't have been admissible. That wouldn't be substantive evidence. It wouldn't be 115-10 type evidence, would it?

MR. FINE: Well, he would have had an opportunity at least to either ask for a sidebar or ask for a recess to interview the remaining witnesses instead of calling them one after the other to basically say we didn't see anything, we're not witnesses in the case, which is contrary to what the defense attorney told the jury during opening statements.

THE COURT: Were these people named in the police report as being present?

MR. MURPHY: No."

¶ 52    As stated, the parties do not dispute that the defense witnesses did not testify in the manner trial counsel promised the jury they would testify. The record supports this. The record does not, however, show *why* counsel did not deliver the promised evidence. Contrary to defendant's suggestion, the record does not show that counsel failed to speak to and sufficiently investigate the witnesses. Posttrial counsel was "not sure" whether (1) counsel failed to speak with the witnesses or (2) those witnesses gave trial counsel information consistent with counsel's opening statement but testified differently, *i.e.*, flipped. Posttrial counsel admittedly had "nothing to substantiate" defendant's allegation that trial counsel failed to interview witnesses. Moreover, trial counsel's decision to present testimony of witnesses not named in police reports strongly suggests that counsel did investigate those witnesses. To the extent that defendant has evidence of trial counsel's alleged deficiency that exists outside the record, the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)) may provide a more appropriate means of seeking redress.

¶ 53    When the basis of a defendant's ineffective assistance of counsel claim is based on matters not of record, the claim cannot be brought on direct appeal. *Kirklin*, 2015 IL App (1st) 131420, ¶ 127. Where the record is silent as to counsel's strategy, the defendant's ineffective assistance of counsel claim may be more appropriately raised in a collateral proceeding. *Peterson*, 2017 IL 120331, ¶ 81 (citing *Veach*, 2017 IL 120649, ¶¶ 44-46). Where "the record on appeal was not developed to establish either the reasons of the trial attorney or the motives of the witnesses, this issue cannot be resolved on direct appeal." *Kirklin*, 2015 IL App (1st) 131420, ¶ 138. But see *People v. Briones*, 352 Ill. App. 3d 913, 919 (2004) (stating on direct appeal that counsel was required to make a record showing that the defendant changed his mind about testifying or that counsel's strategy changed due to unexpected events, and declining to presume that counsel's failure to present defendant's promised testimony resulted from trial strategy).

¶ 54    Defendant correctly states that when counsel fails to present promised testimony and that failure cannot be attributed to unforeseeable events, counsel's broken promise may be found to be unreasonable, as little is more harmful than the failure to present important evidence

promised in an opening statement. *Briones*, 352 Ill. App. 3d at 918. This record, however, does not permit us to exclude the possibility that trial counsel diligently interviewed the witnesses and that those witnesses substantially changed their account of events without warning. Compare *Winkfield*, 2015 IL App (1st) 130205, ¶ 27 (declining to find ineffective assistance of counsel where the record was silent as to whether the promised witnesses did not testify because of deficient representation, a failure to cooperate, or some unforeseen event), with *Bryant*, 391 Ill. App. 3d at 236-39 (finding on direct appeal that trial counsel's strategy was unreasonable where counsel explained his strategy at a posttrial hearing and the explanation showed counsel's failure to call promised witnesses was not the result of their unavailability or reluctance), and *People v. Davis*, 287 Ill. App. 3d 46, 55-56 (1997) (finding that where defense counsel was surprised by the State seeking the admission of the defendant's prior conviction and failed to present the defendant's promised testimony, counsel was ineffective for failing to investigate). Furthermore, in closing arguments, trial counsel clearly attempted to mitigate the absence of the promised evidence, arguing that the witnesses were reluctant and emphasizing the exculpatory evidence that was presented. See *Winkfield*, 2015 IL App (1st) 130205, ¶ 23. Defendant has not shown on this record that trial counsel was deficient or ineffective.

¶ 55                                    III. Conclusion

¶ 56        The trial court did not abuse its discretion by admitting evidence of a third party's relevant prior bad acts. Additionally, defendant cannot demonstrate that trial counsel was ineffective. Accordingly, we affirm the trial court's judgment.

¶ 57        Affirmed.