NOTICE

Decision filed 11/08/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 170471-U

NO. 5-17-0471

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the |
| ) | Circuit Court of |
| Plaintiff-Appellee, ) | Lawrence County. |
| ) | |
| v. ) | No. 16-CF-14 |
| ) | |
| KEITH D. McKINNEY, ) | Honorable |
| ) | Robert M. Hopkins, |
| Defendant-Appellant. ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Wharton concurred in the judgment.

**ORDER**

¶ 1   *Held*: The defendant's convictions are affirmed where the defendant did not receive ineffective assistance of counsel and where the trial court complied with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Because the defendant was given insufficient admonishments pursuant to Illinois Supreme Court Rule 605(a)(3) (eff. Oct. 1, 2001), and because we cannot determine how much weight the trial court attributed to an improper factor in rendering the defendant's sentence, we vacate the defendant's sentence and remand for resentencing.

¶ 2   This is a direct appeal from the circuit court of Lawrence County. The defendant, Keith D. McKinney, was convicted of attempted first degree murder, aggravated discharge of a firearm, and unlawful possession of weapons by a felon. On October 27, 2017, he was sentenced to an enhanced sentence of 35 years' imprisonment followed by 3 years of

1

mandatory supervised release (MSR).  On appeal, the defendant argues (1) that his trial counsel was ineffective, (2) that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (3) that his case should be remanded so that he may be given proper Illinois Supreme Court Rule 605(a)(3) (eff. Oct. 1, 2001) admonishments and an opportunity to file a motion to reconsider sentence, and (4) that his sentence should be reduced or the cause be remanded for a new sentencing hearing.  For the reasons that follow, we affirm in part, vacate in part, and remand for a new sentencing hearing.

¶ 3                                                    I. BACKGROUND

¶ 4      On July 11, 2016, the defendant was charged by second amended information with one count of attempted first degree murder (720 ILCS 5/8-4(a) (West 2016)) (count I), one count of aggravated battery (*id.* § 12-3.05(e)(2)(i)) (count II), one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)) (count III), and one count of unlawful possession of weapons by a felon (*id.* § 24-1.1(a)) (count IV).  As to count I, it was alleged that the defendant, with the intent to commit first degree murder, took a substantial step toward committing that offense, in that he personally discharged a firearm at Lawrence County deputy Kyle Gilmore.  As to count II, it was alleged that the defendant knew Gilmore was a peace officer performing his official duties when the defendant personally discharged a firearm at him, striking him in the upper torso.  As to count III, it was alleged that the defendant knowingly discharged a firearm at Gilmore while knowing he was a peace officer performing his official duties.  As to count IV, it was alleged that the defendant, who had been convicted of a felony, knowingly possessed a handgun.  The second amended

2

information further indicated that the State would seek a sentencing enhancement on count I because the defendant personally discharged a firearm (*id*. § 8-4(c)(1)(C)).

¶ 5       On July 31, 2017, the defendant's four-day jury trial commenced.  During jury selection, the trial court questioned four panels of prospective jurors and then allowed the State and defense counsel to ask additional questioning.  With all four panels, the court explained to the prospective jurors that it was required to read aloud four constitutional principles, and then it would question them as to the principles.  The court asked the first prospective juror on each panel whether he or she understood one of the four principles and then separately whether he or she would be able to "apply" or "follow" the principle if selected to serve on the jury.  The court then said to the next juror on the panel, "same question," and subsequent jurors were called by name.  The court engaged in this manner of questioning for each of the four principles and all four panels of jurors.  At times during its questioning, the court stated a single principle before questioning a panel regarding that principle, and at other times, the court referenced multiple principles in one statement before addressing the panel.  On at least two occasions, the court combined the questions as to whether jurors understood and could follow a certain principle.

¶ 6       During the State's case-in-chief, Lawrence County Sheriff's Department deputy Kyle Gilmore testified that on the afternoon of February 22, 2016, he was on duty wearing his police uniform and driving an unmarked squad truck when he saw the defendant driving in the opposite direction.  Gilmore, who was acquainted with the defendant, suspected that he was driving with a suspended or revoked license.  After dispatch confirmed that the defendant owned the vehicle, Gilmore followed the defendant to his home at 1309

3

Washington Street in Lawrenceville, Illinois, where the events giving rise to the defendant's charges occurred. Gilmore parked his truck in front of the home, walked toward the car, and verified that the defendant was the driver. The defendant exited the vehicle and complied with Gilmore's request to see a license by handing him an Indiana driver's license.

¶ 7    After Gilmore communicated the defendant's information to dispatch, he was informed that the defendant had a suspended or revoked license in Illinois. Gilmore told dispatch and then the defendant that he was going to be placed under arrest for the traffic offense. The defendant responded that "he was not going back to jail." According to Gilmore, when he attempted to handcuff the defendant, he resisted and pulled away, so Gilmore took the defendant "to the ground" to arrest him. As they went to the ground, Gilmore began to radio for backup, placing his mouth close to the microphone on his left shoulder so he could be heard, but not completely turning his back to the defendant. He then "heard a loud pop and felt a sharp pain in [his] groin." When Gilmore "turned to look back," he "saw that Mr. McKinney had a gun pointed in [his] direction." Gilmore was not able to complete his call for backup.

¶ 8    Gilmore said that he distanced himself from the defendant and told him to "[d]rop the gun." The defendant would not drop his weapon, so Gilmore shot the defendant in the legs. He could not remember how many times he shot the defendant and said, "The sequence of events were a little hard to recall specifically how it played out from there." Even after being shot, the defendant would not drop his weapon, so Gilmore "continued to fire another series of rounds into his leg." Gilmore's memory was that the defendant fell

4

to the ground, firing a wild shot in his general direction before throwing the gun. However, Gilmore admitted that he omitted the fact that he saw the defendant throw the gun from his original and amended incident reports. Gilmore contacted dispatch, yelled "[s]hots fired," and requested an ambulance.

¶ 9 During Gilmore's testimony, the State introduced into evidence State's Exhibit 5, which was an aerial view of the scene, and Gilmore placed an "X" on the defendant's home. The State also introduced State's Exhibit 6, which was a photograph of the defendant's residence that showed the corner of the defendant's car and the corner of Gilmore's truck. Gilmore identified State's Exhibit 1 as the brown external vest carrier and vest he wore during the shooting, which he subsequently placed in his squad truck. Gilmore said his bulletproof vest did not have a round embedded in it before he went on duty that day.

¶ 10 Shortly after the exchange of gunfire, Lawrenceville police officer Brandon Sapp arrived and took control of the scene. At some point after Sapp's arrival, Gilmore informed Sapp that he had been shot. Sapp told Gilmore to sit in his squad truck and wait for medics. Gilmore found the weapon that he believed the defendant used to shoot him in the defendant's "very small front yard." Gilmore initially picked up the weapon, but he put it back down when Sapp told him to do so. When asked if Gilmore gave two different reports of the incident, he admitted there were "several edited versions." Gilmore identified State's Exhibit 3, a Derringer .22 Magnum Cal. and brown leather case, as the gun the defendant pointed at him. He explained that the firearm was inside the brown leather case when he picked it up in the defendant's yard. However, he testified that the firearm was not concealed in the case when it was pointed at him.

5

¶ 11 Gilmore and the defendant received treatment at the scene. Gilmore claimed that while the two of them were receiving treatment, the defendant asked if Gilmore was "okay." Gilmore responded, "F*** you." Gilmore added the defendant's statement to his amended report after his attorney recommended that he include it, though he omitted his response in both of his reports. Gilmore was eventually taken by car to the hospital and released from the hospital that same evening.

¶ 12 On cross-examination, Gilmore explained why he wrote two reports after the incident with the defendant. State police asked to interview Gilmore or for him to submit an amended report because his original report lacked detail. After speaking with his union lawyer, Gilmore filed an amended report. He had never produced an amended report before the defendant's case, though he had provided supplemental information on cases. Gilmore had been a police officer for seven years. The February 22 incident was his "first officer-involved shooting," and he admitted that he did not "know the entire protocol."

¶ 13 Gilmore said that he knew the defendant's vehicle immediately because of a traffic stop that had occurred a couple years prior to February 22, 2016. Gilmore also immediately recognized the vehicle because he and the defendant were neighbors; he lived "about a block away" from the defendant. In his prior contacts with the defendant, Gilmore had never seen the defendant with the type of gun he allegedly pointed at Gilmore during the incident. Although Gilmore included the address for the traffic stop in his report, he omitted the fact that it was the defendant's home. Gilmore knew the defendant had dogs, but he denied having a problem with the dogs and denied receiving complaints from

neighbors about them. The defendant's pitbull was in the backseat of his car during the stop, but the defendant did not try to send it after Gilmore.

¶ 14 Though Gilmore's vehicle had lights, sirens, and an onboard audio-video camera, he did not activate them while he followed the defendant or when he parked at the defendant's home. Gilmore testified that he did not activate his lights or sirens while he was following the defendant's vehicle because he had not verified whether the defendant was driving. Gilmore had been driving his squad truck for three to four years, was trained on how to activate the camera, and could have activated it without activating the lights or sirens. When asked why he did not, Gilmore did not know and thought maybe the memory card was full, though he later claimed his camera equipment was "junk." His vehicle might not have recorded video of the stop due to the angle at which he was parked, but Gilmore admitted it would have captured audio of the stop if he had activated the system.

¶ 15 Gilmore remembered seeing the defendant's crutch during the stop and initially claimed he did not remember where the crutch was when he shot the defendant. However, he later testified that the defendant took his crutch out of the car before Gilmore took him to the ground. State's Exhibit 9A, a photo of the scene, depicts a crutch that appears to be bent next to the open door of the defendant's car. The photo also depicts what appears to be an open prescription bottle on the concrete driveway as well as white pills.

¶ 16 Gilmore admitted that some of what occurred "cannot be a hundred percent remembered because of the stress." He did not see a gun in the defendant's possession or in the immediate area around the defendant before being shot. He testified that the defendant was not wearing gloves during the incident.

¶ 17    Keith Larson testified that he lived at 1314 Washington Street on February 22, 2016. Both at the time of the shooting and at the time of trial, Larson was not personally acquainted with the defendant or Gilmore. Larson did not recognize Gilmore. Although he was familiar with a man who lived on his street who went by the name "Skinny,"[1] Larson was unable to confirm in court whether the defendant was that same man, stating, "If that's him, he's changed a lot." Larson said that Skinny walked "with a cane" and had "long hair" when he last saw him. Larson circled his house on State's Exhibit 5 and explained that his house was "catty-corner" to the defendant's house. Larson admitted that prior to the February 22 incident, the defendant's dogs had chased his mailman and "nipped at him," though he did not remember whether he reported the incident to police or to Gilmore.

¶ 18    On February 22, 2016, Larson was sitting in his recliner when he saw the defendant's vehicle drive down the street with Gilmore's squad truck behind him. Larson "knew it wasn't going to be good," so he got up from his chair, walked to the sliding glass doors of his home, and watched what happened next. Larson saw the defendant pull into his driveway and the officer park in front of the house. When the officer approached the defendant, Larson saw the defendant get out of his vehicle and hand the officer "papers." Larson's sliding glass doors were shut, and he was unable to hear any conversation between the two men. Larson "thought everything was going to be okay," so he went to the kitchen to check on some food that was in the microwave.

---

[1]It is undisputed that Skinny was the defendant's nickname.

¶ 19    Larson claimed he then heard a single shot and ran back to the sliding glass doors. When Larson looked out this second time, he claimed he saw a second shot with the same caliber gun. The officer and the defendant were about seven feet apart when Larson first returned to the glass doors, but the officer quickly retreated behind the tailgate of his squad truck while the defendant remained standing by the side of his car. Though Larson claimed he saw the defendant "pointing a gun" and in a "shooting position," he admitted on cross-examination that he did not see a gun in the defendant's hands because the officer was obstructing his view of the "line of fire." Larson admitted he told police officers that he "couldn't tell what, if anything," the defendant was holding. Larson observed the officer with his gun drawn, shoot four or five shots, and then the defendant went to the ground. Larson believed he heard a total of seven shots. He estimated his house to be about 50-75 feet from the location of the incident.

¶ 20    When asked by defense counsel about the first shot fired and whether Larson reported it as sounding "like a loud boom," Larson responded that it "[s]ounded like the same shot as the other one." Pursuant to counsel's questioning, Larson testified that he had "been hunting [since he was] 12 years old" and knew guns. Larson said, "police officers usually carry 9 millimeters, 40 to 45s," and referring to the first shot, he said that officers' guns "[m]ake a lot louder noise than what [he] heard."

¶ 21    Meanwhile, Sapp was nearby issuing a citation. Sapp testified that he did not hear Gilmore's "shots fired" call, but he heard "mic scuffles," which led him to believe that Gilmore was in a fight and unable to radio. Sapp learned that Gilmore was requesting backup at the defendant's address, so he drove to the defendant's home and arrived about

one minute later. Sapp and Gilmore's radio calls to dispatch were admitted and played for the jury. Sapp turned on his lights and sirens, which caused his dashboard camera to begin recording video, though it was not capable of recording audio. After he arrived at the defendant's home, Sapp saw Gilmore near the front of his truck while the defendant was on the ground on his stomach with his arms over his head and blood pooling under his leg. At this point, Sapp did not know that shots had been fired, but he had heard a request for medics, so he thought the defendant was having a medical issue. After learning from Gilmore that they were dealing with a "shots-fired incident" and the location of the defendant's gun was unknown, Sapp's first instinct was to determine whether the defendant was still armed.

¶ 22    Sapp handcuffed the defendant with Gilmore's assistance. The defendant was compliant with commands but was "writhing around in pain." Sapp then searched the defendant for weapons. At this point, Gilmore approached Sapp and said, "I've been shot, too." Sapp looked up and saw what appeared to be an impact from a bullet in the sternum area of Gilmore's bulletproof vest. Sapp radioed for an additional medical unit and told Gilmore to sit in his truck.

¶ 23    Gilmore initially went to his truck, but while Sapp was still on the ground searching the defendant for weapons, Sapp saw Gilmore pick up an object in the yard. Sapp heard Gilmore say he found the gun, which Sapp described as "some kind of a gun in a wallet." Sapp told Gilmore to put it back where he had gotten it to try to preserve the scene. Sapp had never seen the gun prior to Gilmore picking it up.

10

¶ 24    Sapp believed from Gilmore's demeanor that he was "in a state of shock."  Medics had Gilmore remove his vest and shirt, and those items were placed in his truck.  Sapp saw Gilmore when he was "bare-chested" and "didn't see any visible injuries."  The medics moved Gilmore closer to the defendant, who was also being treated for his injuries.  Sapp heard the defendant say, "I'm sorry, Kyle," to which Gilmore responded, "F*** you."  Sapp did not include Gilmore's response in his original incident report.

¶ 25    Sapp's dash cam footage, State's Exhibit 7, was played for the jury.  According to Sapp, at 3:48:04, the video showed Gilmore's vest being placed inside his truck.  Sapp claimed that while watching the video, he was able to see when Gilmore found the weapon in the front yard and when he put it back down.  Much of what occurred at the scene was to the right of the view of Sapp's camera and could not be seen.  However, the video showed Gilmore walking to his truck at 3:39:37 and leaning inside the vehicle before walking back toward the defendant's location on the ground, while appearing to hold something.  Less than a minute later, Gilmore could be seen bending down and reaching toward the ground, walking toward his truck, and then stopping and returning to bend down toward the ground again, though the video did not clearly depict a gun.

¶ 26    On cross-examination, Sapp admitted that he wrote in his report that Gilmore tried to take the gun he found in the defendant's yard to his squad truck.  Sapp confirmed that Gilmore should not have picked up the gun because he was an alleged victim and no longer an investigator, and the gun should have remained where it was to preserve the scene.  The proper thing for Gilmore to do would have been to leave the gun in its location so that it could have been photographed first.  Gilmore went to the hospital with his service weapon,

11

and Sapp said that if they had more officers at the scene, they would have taken Gilmore's service weapon at the scene so that it could be given to a crime scene investigator.

¶ 27 Sergeant Abigail Henn, a crime scene investigator with the Illinois State Police, responded to the scene of an officer-involved shooting in Lawrenceville on February 22, 2016. Upon arrival, Henn found a firearm in a square leather holster in the defendant's front yard. She opened the wallet-shaped holster to reveal a Derringer .22 Magnum. Henn removed the gun from the holster and opened the chamber, revealing two fired casings inside, which she removed before photographing them and the gun. She also photographed multiple .40-caliber cartridge casings at the scene. The gun, the leather holster, and the two extra live rounds tucked inside the holster were admitted into evidence. The State also admitted a diagram depicting where Henn found the evidence at the scene.

¶ 28 The day after the shooting, Henn went to Wells' Auto Body in Lawrenceville, cut open Gilmore's bulletproof vest, and located a bullet inside the breastplate. She removed and photographed the bullet. She also photographed the external vest carrier, which had a small hole in it, and the breastplate, which had a small defect or hole. Pursuant to the State's questioning, Henn testified that the bullet found near the defendant's car was "quite a bit larger" than the bullet removed from the breastplate in Gilmore's vest. When trial counsel asked Henn whether she had done an "eye comparison between the live round from the .22 Derringer" and the bullet removed from the breastplate, she said she had not. Henn was not a ballistics expert and performed no ballistics testing in this case.

¶ 29    After Henn's testimony, a stipulation as to the defendant's felony status was admitted into evidence.  The State then dismissed count II (aggravated battery with a firearm) because it failed to prove that Gilmore had a physical injury.

¶ 30    Lawrence County Sheriff's Department deputy Jordan Feutz testified that on February 22, 2016, he took the defendant into custody, rode with him in the ambulance, and remained with him at the hospital.  While the defendant was in the trauma room and being treated, Feutz "stepped out and kept eyes on him from the outside of the room." Feutz claimed he overheard a doctor ask the defendant why he "had shot the cops" and the defendant respond, "I'm tired of him f****** with me."  Feutz admitted that when the defendant allegedly made the statement, he was in pain after having been shot and had not yet been to surgery to have the bullet removed from his leg.

¶ 31    Following Feutz's testimony, the State rested its case.  The defense filed a motion for directed verdict, which was denied.

¶ 32    Clara Bird testified on behalf of the defense.  Bird lived at 1305 Washington Street, which was "[r]ight next door" to the defendant.  Bird had known the defendant for 34 years. She had never seen him with the gun depicted in State's Exhibit 17 or with any guns.  Bird identified her home on State's Exhibit 5 by writing "Bird" on it.  Gilmore lived "[r]ight across a parking lot" from Bird; she explained that Gilmore's back door faced her property and "right into Skinny's front door."  Bird explained that while Gilmore's home was not visible in State's Exhibit 5, his back yard was.  Gilmore's house was right next to the lot that was visible in the photo; Bird drew a square and wrote "House" to indicate its location. Bird testified that, from her front yard, she saw Gilmore stand at his back door and stare at

13

the defendant's house as often as four or five times per week over a period of two or three months. This made Bird feel "very uneasy," and she "thought it was a very unhealthy situation."

¶ 33   On February 22, 2016, Bird was sick and in bed, but she was awake. Bird heard six to eight "very loud shots," "in very rapid succession," though she did not get out of bed to see what was happening. After some objections and argument, Bird testified that the shots she heard were "a very loud sound" that was "[m]ore of a boom" than "a pop." Following Bird's testimony, the defense rested. Outside the presence of the jury, the defendant confirmed that he did not wish to testify.

¶ 34   During jury deliberations, the jury requested to see Gilmore's testimony, an aerial view of the crime scene, the gun, and the gun holster. The trial court informed the jurors that they would have to rely on their recollections and notes regarding Gilmore's testimony, that they had State's Exhibits 5 and 22 to review, and that the sheriff would bring the gun and holster for them to view.

¶ 35   Thereafter, the jury found the defendant guilty of count I (attempted first degree murder), count III (aggravated discharge of a firearm), and count IV (unlawful possession of weapons by a felon). The jury further found that the defendant personally discharged a firearm.

¶ 36   On October 27, 2017, a sentencing hearing was held. The State presented no evidence in aggravation but asked the trial court to consider the presentence investigation report. In mitigation, the defendant presented testimony from his relatives that he was "one of the nicest guys a person could be," he loved and helped his family, they loved and

14

supported him, and he was being blamed for something he did not do. Though trial counsel argued that the defendant's age and health were mitigating factors, the court found no mitigating factors were present. While the court stated it was considering the defendant's medical condition, it found that imprisonment would not endanger his medical condition. In aggravation, the court considered that the defendant's conduct caused or threatened serious harm, that he had a substantial criminal history, and that the sentence was necessary to deter others. Thereafter, the court sentenced the defendant to an enhanced sentence of 35 years' imprisonment followed by 3 years of MSR as to count I and 5 years' imprisonment followed by 1 year of MSR as to count IV, with the sentences to run concurrently. The defendant was not sentenced on count III based on the one-act, one-crime doctrine.

¶ 37    The defendant filed his notice of appeal on November 13, 2017.[2]

¶ 38                                  II. ANALYSIS

¶ 39    On appeal, the defendant makes four contentions. First, he argues that he was denied effective assistance of counsel. Second, he asserts that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*. Third, he contends that the case should be remanded so that he can be properly admonished pursuant to Illinois Supreme Court Rule 605(a)(3) (eff. Oct. 1, 2001) and provided with an opportunity to file a motion to reconsider this sentence. Fourth, he maintains that his sentence should be reduced, or the cause be remanded for a new sentencing hearing.

_____

[2]To avoid unnecessary repetition, additional relevant facts and procedural posture will be set forth as part of our analysis in section II. below.

¶ 40                    A. Ineffective Assistance of Counsel

¶ 41   The defendant first argues that he was denied effective assistance of counsel.  Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984).  To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and (2) a reasonable probability exists that, but for the error, the result would have been different (prejudice prong).  *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011).  A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel.  *People v. Evans*, 209 Ill. 2d 194, 220 (2004).  Thus, defendant's failure to establish either deficient performance or prejudice will be fatal to the claim.  *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 42   To establish deficiency under the first prong of the *Strickland* test, defendant must overcome the strong presumption that the complained-of action or inaction might have been the product of counsel's sound trial strategy.  *Manning*, 241 Ill. 2d at 327.  The reviewing court must evaluate counsel's performance from her perspective at the time rather than "through the lens of hindsight."  *People v. Perry*, 224 Ill. 2d 312, 344 (2007).  An evaluation of counsel's actions cannot extend into matters involving the exercise of judgment, strategy, or trial tactics.  *People v. Penrod*, 316 Ill. App. 3d 713, 722 (2000).  "Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable."  *Manning*, 241 Ill. 2d at 335.

16

¶ 43    To establish prejudice, "defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Richardson*, 189 Ill. 2d at 411.  If defendant's claim can be disposed of on the basis that he suffered no prejudice, then a court should not decide whether counsel's performance was deficient.  *People v. Villanueva*, 382 Ill. App. 3d 301, 308 (2008).

¶ 44    The defendant asserts that trial counsel was ineffective for making unfulfilled promises to the jury that (1) the defendant would testify that he was not wearing gloves during the altercation with Gilmore, and (2) the jury would hear evidence proving that it was impossible for the bullet recovered from Gilmore's vest to have been discharged from the gun recovered from the defendant's yard.  When, contrary to counsel's promise in opening statements, defendant does not testify, and the failure to present the promised testimony cannot be attributed to unforeseeable events, counsel's broken promise can be unreasonable.  *People v. Briones*, 352 Ill. App. 3d 913, 918 (2004).  However, "counsel's failure to provide promised testimony is not ineffective assistance *per se*."  *People v. Manning*, 334 Ill. App. 3d 882, 892 (2002).  Defendant must show that counsel's decisions were unreasonable and that there was a reasonable probability that an error affected the outcome of the proceeding.  *Id.*

¶ 45    In response, the State contends, *inter alia*, that because the defendant's claim cannot be resolved based on the record before us, it is more appropriately raised in a postconviction proceeding.  In support of its position, the State cites *People v. Talbert*, 2018 IL App (1st) 160157, and *People v. Winkfield*, 2015 IL App (1st) 130205.

17

¶ 46    In *Talbert*, the First District reviewed defendant's claim that his counsel was ineffective for failing to present witnesses to provide exonerating testimony that he promised during opening statements. *Talbert*, 2018 IL App (1st) 160157, ¶¶ 47-54. The court instructed:

> "When the basis of a defendant's ineffective assistance of counsel claim is based on matters not of record, the claim cannot be brought on direct appeal. [Citation.] Where the record is silent as to counsel's strategy, the defendant's ineffective assistance of counsel claim may be more appropriately raised in a collateral proceeding." *Id.* ¶ 53.

The court found that based on the record before it, it could not "exclude the possibility that trial counsel diligently interviewed the witnesses and that those witnesses substantially changed their account of events without warning." *Id.* ¶ 54. Because defendant could not show from the trial record that defense counsel was ineffective, the court affirmed his convictions. *Id.* ¶¶ 54, 56.

¶ 47    In *Winkfield*, the First District considered whether defense counsel was ineffective for failing to call certain alibi witnesses as promised in his opening statement. *Winkfield*, 2015 IL App (1st) 130205, ¶¶ 18-38. The court affirmed defendant's conviction, finding that the record on appeal was inadequate to determine whether counsel's failure was "due to any deficient representation or merely a failure [on the part of the witnesses] to cooperate or appear, or some other unforeseen [or] unexpected event." *Id.* ¶¶ 27, 38. The court found that disposition of defendant's claim required inquiry into matters outside the record on direct appeal. *Id.* ¶ 27. The court held that when the record is insufficient to address an ineffective assistance claim, a reviewing court "may decline to adjudicate the claim in a

18

direct appeal in favor of addressing it in a proceeding for postconviction relief where matters outside the common law record can be considered." *Id*. ¶ 28.

¶ 48 In the present case, the record on direct appeal is similarly insufficient to address the defendant's ineffective-assistance-of-counsel claim regarding trial counsel's alleged failure to present evidence he promised during opening statements. During his opening statement, defense counsel told the jury, "Skinny's going to tell you he wasn't wearing any gloves. He wasn't—he had no reason to. He was driving home from the doctor. He didn't plan on any of this." The fact that the defendant was not wearing gloves was elicited during Gilmore's testimony. However, the defendant ultimately did not testify at trial. During the trial court's colloquy regarding the defendant's decision not to testify, he was asked whether the decision was made "on advice of counsel" and answered in the affirmative. This is the extent of the insight the record provides as to the matter. As such, we do not know whether the defendant planned to testify during opening statements and later changed his mind, whether there was a change in strategy that led to him not testifying, or any unforeseen or unexpected circumstances that may have led to his decision.

¶ 49 The defendant also complains of the following alleged promise during trial counsel's opening statement:

> "And there is no bullet that will be taken from that *** you will see that came out of that bulletproof vest that is going to match the—any bullet that would've— could've been fired from that little gun. In fact, you're going to hear that the bullet that was taken out of that bulletproof vest was too big to have come from the .22 that they're saying that Skinny had. Couldn't have shot him."

¶ 50 No ballistics evidence was introduced during the State's case-in-chief. Defense counsel attempted to elicit from crime scene investigator Henn whether she conducted a

19

visual inspection of the bullet retrieved from Gilmore's vest, but she had not. Again, the record is devoid of any explanation as to why trial counsel did not provide the promised ballistics evidence, if any such evidence existed.

¶ 51    Given the incomplete record on direct appeal regarding counsel's reasons for failing to present the defendant's testimony or ballistics evidence, we would be required to engage in speculation and conjecture to determine whether counsel's decision was tactical or the result of ineffectiveness. Our supreme court has held, though, that we cannot resolve a claim of ineffective assistance based on conjecture or speculation. *People v. Bew*, 228 Ill. 2d 122, 134-35 (2008). As the record is insufficient for us to resolve the defendant's claim of ineffective assistance, we decline to adjudicate the claim on direct appeal, considering this is a postconviction proceeding where matters outside the common law record cannot be considered and a factual basis cannot be developed for resolution of the issue. See *Talbert*, 2018 IL App (1st) 160157, ¶ 53; *Winkfield*, 2015 IL App (1st) 130205, ¶ 28.

¶ 52                          B. Rule 431(b) Admonishments

¶ 53    The defendant next asserts that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*. He concedes that he did not raise this issue during trial or in a posttrial motion but argues that the error is subject to plain-error review because the evidence in this case was closely balanced. On appeal, the State concedes that the court failed to issue proper admonishments. We do not accept the State's concession because we find that, in light of recent Illinois Supreme Court precedent, the trial court's admonishments sufficiently complied with Rule 431(b).

20

¶ 54 Rule 431(b) requires that the trial court ask all potential jurors whether they understand and accept four fundamental principles of criminal law: (1) that defendant is presumed innocent of the charges against him, (2) that the State must prove defendant guilty beyond a reasonable doubt, (3) that defendant is not required to offer any evidence on his own behalf, and (4) that defendant's decision to not testify cannot be held against him. *Id*. These four principles are commonly referred to as the *Zehr* principles. See *People v. Zehr*, 103 Ill. 2d 472 (1984). Rule 431(b) mandates

> "a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 55 The plain-error doctrine allows a reviewing court to consider an unpreserved error when a clear or obvious error occurred and the evidence at trial was closely balanced or that error was so egregious as to deny defendant a fair trial. *Id*. at 613. The first step in plain-error review is to determine whether any error has been committed at all. *Id*.

¶ 56 Recently, the supreme court has rejected a similar argument to the one the defendant makes in this case regarding the combining of Rule 431(b) questions. Specifically, in *People v. Birge*, 2021 IL 125644, ¶ 23, defendant argued that the trial court erred in admonishing the jury venire under Rule 431(b) "by grouping the principles into one broad statement of law," thereby failing "to ensure that the potential jurors understood and accepted each of the four distinct concepts enumerated in the rule." In finding no merit to defendant's claim, the court relied on the plain language of the rule, stating as follows:

21

"Here, the circuit court read the specific principles set forth in the rule verbatim to the prospective jurors and asked the specific questions required by the rule. Each of the prospective jurors indicated that they understood and accepted those principles by a show of hands. The rule plainly states that the court can ask the questions to the potential jurors as a group, and the rule does not require that their response be conveyed orally rather than by a show of hands. We believe that the procedure followed by the circuit court was all that was required by the plain language of the rule." *Id.* ¶ 27.

¶ 57 The supreme court further explained that neither case law nor the plain language of the rule required the trial court to explain the principles in any particular fashion or "recite the principles separately to the prospective jurors." (Emphasis omitted.) *Id.* ¶ 34. Ultimately, it held that under Rule 431(b)'s plain language, a court complies with the rule "if it (1) instructs the prospective jurors on the four principles, (2) asks if the prospective jurors understand those principles, and (3) asks if the prospective jurors accept those principles." *Id.*

¶ 58 Here, the trial court explained to all four panels of prospective jurors that it was required to read aloud four constitutional principles, and then it would question them as to the principles. The court asked the first prospective juror on each panel whether he or she understood one of the four principles and then separately whether he or she would be able to apply or follow the principle if selected to serve on the jury. The court then said to the next juror on the panel, "same question," and subsequent jurors were called by name. The court engaged in this manner of questioning for each of the four principles and all four panels of jurors. At times during its questioning, the court stated a single principle before questioning a panel regarding that principle, and at other times, the court referenced multiple principles in one statement before addressing the panel. On at least two occasions,

22

the court combined the questions as to whether jurors understood and could follow a certain principle.

¶ 59    Like in *Birge*, we find no clear or obvious error by the trial court. Specifically, neither supreme court precedent nor the plain language of Rule 431(b) required the court to separate its questioning in any particular manner. In this case, the court's method of inquiry was sufficiently compliant with the rule because it instructed the venire panels as to each of the four principles and inquired as to both the jurors' understanding and acceptance of those principles. Under these circumstances, the court's method of inquiry complied with the mandate of Rule 431(b). Accordingly, there was no clear and obvious error and, thus, no plain error.

¶ 60                    C. Rule 605(a)(3) Admonishments and Sentencing

¶ 61    We will discuss the defendant's final two points together for ease of analysis. In the defendant's third point on appeal, he contends that the trial court failed to comply with Illinois Supreme Court Rule 605(a)(3) (eff. Oct. 1, 2001) at his sentencing hearing when it gave him insufficient admonishments after sentencing him. In his fourth point on appeal, the defendant asserts that he was denied a fair sentencing hearing when the court (1) relied on an improper aggravating factor and (2) incorrectly found that there were no mitigating factors.

¶ 62    With respect to his Rule 605(a) claim, the defendant specifically argues the trial court failed to admonish him that (1) his right to appeal his conviction would only be preserved if he filed a notice of appeal within 30 days; (2) in order to appeal his sentence or any aspect of the sentencing hearing, he must file a motion to reconsider sentence within

23

30 days after the sentence was imposed; (3) all issues or claims of error regarding the sentence or sentencing hearing must be set forth in the motion; (4) any claims of error not raised in the written motion would be deemed waived; and (5) in order to preserve the right to appeal following the disposition of the motion to reconsider sentence, he must file a notice of appeal within 30 days from the entry of the order disposing of the motion. He maintains that he was prejudiced by the court's failure because his sentencing claim was forfeited by his failure to file a motion to reconsider sentence. Thus, he contends that this case should be remanded so that he can be properly admonished pursuant to Rule 605(a) and given an opportunity to file a motion to reconsider his sentence. The State responds that, notwithstanding the insufficient admonishments, we may consider the defendant's sentencing claim on its merits.

¶ 63     Rule 605(a)(3) provides that in cases where a defendant is sentenced after a plea of not guilty, the trial court shall, at the time of sentencing, admonish him: (1) that the right to appeal the judgment of conviction, excluding the sentence imposed or modified, will be preserved only if he files a notice of appeal in the trial court within 30 days from the date on which the sentence is imposed; (2) if he seeks to challenge his sentence, or any aspect of the sentencing hearing, he must file a written motion to reconsider the sentence within 30 days of sentencing; (3) any claim of error regarding the sentence imposed, or any aspect of the sentence, shall be deemed waived if not raised in the written motion to reconsider the sentence; and (4) defendant must file a notice of appeal within 30 days from the entry of the order disposing of the motion to reconsider sentence or order disposing of any challenges to the sentencing hearing, if he wishes to preserve his right to appeal. *Id*.

24

However, not every case of improper admonishment requires remand. Where a court fails to properly admonish a defendant in accordance with Rule 605(a)(3), remand is only required if he is prejudiced or denied real justice as a result of the inadequate admonishments. *People v. Henderson*, 217 Ill. 2d 449, 466 (2005).

¶ 64 Here, after the defendant was sentenced, the following exchange took place:

> "THE COURT: Mr. McKinney, you have the right, if you wish, to appeal from the Court's sentence and judgment entered today. If you wish to appeal, you must file within 30 days of today's date either a notice of appeal or some other post-trial motion which would keep jurisdiction in the trial court.
> If you do not file either a notice of appeal or some other kind of motion which would keep jurisdiction in the trial court within 30 days, then you will have no right to appeal. If you do file a notice of appeal, the Court will appoint an Appellate Defender to represent you, and a transcript will be prepared of the proceedings in this case.
> If you file another post-trial motion, the Court will appoint counsel to represent you. If you so request, a transcript will be provided for use in connection with that motion. Do you have any questions concerning your appeal rights, Mr. McKinney?
>
> THE DEFENDANT: No."

¶ 65 Thus, the record indicates that the trial court did not instruct the defendant that he must file a motion to reconsider sentence if he wished to challenge his sentence or any aspect of his sentencing hearing. He was also not instructed that any issues not raised in a motion to reconsider sentence would be waived for appellate review. Finally, the court failed to admonish him that if he wished to preserve his right to appeal the entry of an order disposing of the motion to reconsider sentence or order disposing of any challenges to the sentencing hearing, he must file a notice of appeal in the trial court within 30 days from the entry of such order. Accordingly, the court did not comply with Rule 605(a)(3).

25

¶ 66 We now turn to the question of whether the defendant was prejudiced by the trial court's insufficient admonishments. As to the issue of prejudice, we find this case to be similar to *People v. Glenn*, 363 Ill. App. 3d 170, 177-81 (2006). There, the trial court failed to properly admonish defendant as to how to preserve sentencing errors for appeal, and the Second District considered whether he was " 'prejudiced or denied real justice' " to warrant remand. *Id.* (quoting *Henderson*, 217 Ill. 2d at 465). In contrast to *Henderson*, where defendant failed to raise any issues pertaining to his sentence on appeal, defendant in *Glenn* raised a sentencing issue in his original appellate brief. *Id.* at 177-78. Specifically, defendant claimed that the trial court considered the threat of serious harm to others as an aggravating factor when that factor was "already accounted for when the legislature classified the offense and set the range of potential punishment." *Id.* at 178. With guidance from *Henderson*, the *Glenn* court concluded that determining whether a defendant established prejudice or a denial of real justice

> "depends upon the circumstances and that such inquiries necessarily will be practical and situation specific. Given the discretion to take whatever action is appropriate by the supreme court, we can conclude only that a defendant must demonstrate to us that he or she has been denied some real opportunity to litigate something of substance and that some remedy is necessary—most likely an opportunity to be heard on that issue. After all, by vesting us with discretion, the supreme court presumably wanted us to exercise it to correct something that needs correcting. It follows, then, that a defendant must 'alert' us to something that requires some action." *Id.* at 179.

¶ 67 Nevertheless, the State argued that remand was unnecessary and a waste of time and judicial resources, and it urged the appellate court to review defendant's sentencing claim on its merits. *Id.* at 180. The court acknowledged that considerations of wasted time and judicial resources were entitled to some weight and concluded that to remand merely to

26

allow defendant to file a motion to reconsider sentence would indeed waste judicial resources in that case. *Id.* However, the court disagreed with the State's assertion that defendant's claim that the trial court considered an improper aggravating factor lacked merit. *Id*. at 180-81. The trial court mentioned the threat of harm to others during defendant's sentencing, and thus, the appellate court disagreed with the State's argument that the trial court gave insignificant weight to the factor. *Id.* The court held that when a trial court relies upon an improper factor in sentencing and the court of review cannot ascertain from the record whether the consideration of that factor affected the sentence, the proper resolution is to vacate defendant's sentence and remand so that defendant could be resentenced. *Id*. at 178, 180-81.

¶ 68    Here, although the defendant was not provided with the proper Rule 605(a)(3) admonishments, he has alerted us to the sentencing issue that the trial court relied on the improper aggravating factor that his conduct caused or threatened serious harm in determining the length of his sentence, because the factor was inherent to the offense of attempted first degree murder. The State responds that (1) the defendant forfeited this argument by failing to object to the presentence investigation report, (2) he cannot establish plain error, and (3) he failed to establish that the court placed significant weight on that factor when determining his sentence for attempted first degree murder. For the reasons that follow, however, we find that the defendant has raised a nonfrivolous sentencing issue that requires our action. See *id*. at 179. We further find that the defendant has established that he is entitled to plain-error relief, and remand is necessary so that he may be resentenced based on/after a consideration of the proper sentencing factors

27

¶ 69   In order to preserve an alleged error for consideration on appeal, a defendant must object to the error in the trial court and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. Issues not raised at trial and in a posttrial motion are forfeited. *Id.* However, a reviewing court may exercise its discretion and excuse a defendant's procedural default to review a plain error when: (1) "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.*

¶ 70   A sentencing court's improper consideration of a factor in aggravation is a clear error that affects the substantial rights of a defendant under the second prong of the plain-error doctrine. *People v. Martin*, 119 Ill. 2d 453, 458-60 (1988) (holding that the trial court's consideration of a factor inherent in the offense as an aggravating factor "clearly affected the defendant's fundamental right to liberty"); *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 17 (reversing defendant's sentence under the second prong of the plain-error doctrine where trial court improperly considered the aggravating factor that defendant's conduct caused or threatened serious harm, which was a factor inherent in the offense of first degree murder). Therefore, despite the defendant's failure to preserve this issue for our review on appeal, we may consider it as second-prong plain error.

¶ 71   The range of sentences permissible for an offense is set by statute. *People v. Saldivar*, 113 Ill. 2d 256, 267 (1986). All sentences should consider the seriousness of the

28

crime and the objective of returning the offender to useful citizenship. Ill. Const. 1970, art. I, § 11. In fashioning the appropriate sentence, the trial court must carefully weigh all of the factors in mitigation and aggravation, which include defendant's age, demeanor, habits, credibility, criminal history, social environment, and education as well as the nature and circumstances of the crime and of defendant's conduct in the commission of the crime. *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010). Further, the Unified Code of Corrections permits the trial court to consider certain statutory factors in aggravation and mitigation when imposing a sentence of imprisonment. 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2016). A court has considerable latitude in sentencing a defendant, as long as it neither ignores relevant mitigating factors nor considers improper aggravating factors. *People v. Flores*, 404 Ill. App. 3d 155, 157 (2010).

¶ 72 A factor that is implicit in the offense cannot be used by the sentencing judge in aggravation to justify a more severe sentence than might otherwise be imposed. *Saldivar*, 113 Ill. 2d at 266-67. The prohibition against the dual use of an aggravating factor—a double enhancement—is based upon the assumption that the legislature considered the factors inherent in the offense when designating the appropriate range of punishment for a criminal offense. *People v. Johnson*, 2019 IL 122956, ¶ 38. The rule against such a double enhancement is not intended to be so rigidly applied as to restrict the function of the sentencing judge by forcing him or her to ignore factors that are relevant to the imposition of a sentence. *Saldivar*, 113 Ill. 2d at 268.

¶ 73 In *Saldivar*, defendant fatally stabbed the victim twice in the chest after the victim had lured defendant to his home under the guise of a party taking place, resulting in the

two men being alone. *Id*. at 260-61. According to defendant's confession, the victim made sexual advances toward him, a struggle ensued, and defendant stabbed the victim. *Id*. Defendant was charged with murder, and, after a bench trial, he was found guilty of the lesser included offense of voluntary manslaughter. *Id*. at 259-61. In sentencing defendant to seven years' imprisonment, the trial court found as the primary factor in aggravation, " 'the terrible harm that was caused to the victim,' " noting that defendant's conduct caused death. *Id*. at 264.

¶ 74 The Illinois Supreme Court held that in sentencing a defendant on a conviction for voluntary manslaughter it was permissible for a trial court to consider the force employed and the physical manner in which the victim's death was brought about when applying the aggravating factor that defendant's conduct caused serious harm to the victim. *Id*. at 271. In applying that principle, the court found that the trial court's consideration of the serious harm defendant caused to the victim in aggravation in that case was improper because the finding "was not directed at the degree or gravity of the defendant's conduct, *i.e.*, the force employed and the physical manner in which the victim's death was brought about or the nature and circumstances of the offense." *Id*. at 271-72. Rather, the record showed the trial court focused on the result of defendant's conduct, which was the victim's death—a factor implicit of the offense of voluntary manslaughter. *Id*. at 272.

¶ 75 In *Sanders*, the Third District reversed defendant's sentence of 45 years' imprisonment for first degree murder under the second prong of the plain-error doctrine, holding that the trial court had improperly considered in aggravation the factor that defendant's conduct caused or threatened serious harm, which was a factor inherent in the

30

offense of first degree murder. *Sanders*, 2016 IL App (3d) 130511, ¶¶ 6, 17. In sentencing defendant, the trial court stated in aggravation that defendant's conduct caused harm, and then it acknowledged that the factor was inherent in the offense but reasserted that the conduct " 'did occur.' " *Id.* ¶¶ 6, 14. The appellate court reversed defendant's sentence, finding "the trial court's express finding that the defendant's conduct caused or threatened serious harm, a factor inherent in the offense of first degree murder, impinged on the defendant's right not to be sentenced based on an improper factor and affected his fundamental right to liberty." *Id.* ¶ 17 (citing *Martin*, 119 Ill. 2d at 458).

¶ 76 Similarly, in the present case, the trial court merely stated that it was considering, as a factor in aggravation, that the "defendant's conduct caused, or rather, threatened serious harm." The court provided no further explanation, did not refer to the degree of harm or gravity of the defendant's conduct, and did not direct its consideration to the nature or circumstances of the offense. In light of the aforementioned precedent, we find that the court's express consideration of a factor that was inherent in the offense of attempted first degree murder "impinged on the defendant's right not to be sentenced based on an improper factor and affected his fundamental right to liberty." *Id.* Therefore, the defendant has established that he is entitled to relief under the second prong of the plain-error doctrine.

¶ 77 Further, we cannot agree with the State that the trial court placed insignificant weight on the improper aggravating factors or that it solely considered the factor when rendering the defendant's sentence as to unlawful possession of a weapon by a felon. Under such circumstances, the proper remedy is to remand for a new sentencing hearing.

31

*Glenn*, 363 Ill. App. 3d at 178, 180-81 (citing *People v. Bourke*, 96 Ill. 2d 327, 332 (1983); *People v. McCain*, 248 Ill. App. 3d 844, 853 (1993)). Given the discretion vested in us by our supreme court in resolving appeals involving insufficient Rule 605(a)(3) admonishments, and the power given to us by Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) to "grant any relief, including a remandment, *** that the case may require," this result is one that we have clear authority to order. See *Glenn*, 363 Ill. App. 3d at 181. Further, we find that it serves the interests of both judicial efficiency and justice. Because we are vacating the defendant's sentence and remanding for a new sentencing hearing, the defendant will have the opportunity to assert his health as a mitigating factor, and we need not address the argument at this time.

¶ 78                              III. CONCLUSION

¶ 79    For the foregoing reasons, we affirm the defendant's convictions. We vacate the defendant's sentence, and the cause is remanded so that the trial court may conduct a new sentencing hearing and resentence the defendant.


¶ 80    Affirmed in part and vacated in part; cause remanded.